Clifton W. ZANG, Appellant,

v.

Jesse BROWN, Secretary of Veterans
Affairs, Appellee.

No. 93–1213.

United States Court of Veterans Appeals.

Oct. 5, 1995.

Clifton W. Zang, pro se.

Mary Lou Keener, General Counsel; Norman G. Cooper, Assistant General Counsel; Pamela L. Wood, Deputy Assistant General Counsel; and Amy S. Gordon, Washington, DC, were on the brief, for the appellee.

Before MANKIN, IVERS, and STEINBERG, Judges.

STEINBERG, Judge:

The appellant, Vietnam-era veteran Clifton W. Zang, appeals a September 3, 1993, Board of Veterans' Appeals (BVA or Board) decision denying entitlement to a permanent and total disability rating for pension purposes. For the reasons that follow, the Court will affirm the BVA decision.

## I. Background

The veteran served on active duty in the United States Marine Corps from December 1968 to December 1972. Record (R.) at 15. The record on appeal does not contain service medical records. In August 1988, the veteran filed a claim with a Department of Veterans Affairs (VA) regional office (RO) for VA disability pension benefits based on total blindness. R. at 17–20. In September 1988, VA received notice from the Oregon Correctional Facility that the veteran was incarcerated with a life sentence for conviction of a felony committed on March 24, 1983. *See* R. at 70.

A November 1988 VA Report of Accidental Injury, submitted by the veteran in support of his claim, stated that on March 24, 1983,

the veteran had received a gunshot wound to his head which "severed the optic nerve of both eyes, resulting in total blindness" and which caused "severe memory loss". R. at 22–23. The form also stated that the veteran had been intoxicated at the time of the injury, that the persons responsible for the injury were unknown to him, and that police records from the Hillsboro, Oregon, police department "do not definitely establish a full account of the incident." R. at 22.

A January 1989 letter from the Hillsboro police, in response to a VA inquiry, stated that the veteran had been "involved in a situation where he [had] shot and killed a girlfriend and her male companion, [had] left the scene of the shooting, [had driven] a short distance[,] and shot himself in the head, causing blindness to himself." R. at 25. Police department records noted that the veteran's "only apparent injury was the bullet wound to the head". R. at 41.

In February 1989, the RO, noting that a person is responsible for injuries or death which result "directly and immediately from indulgence in alcohol" and that willful misconduct is the "willingness to achieve a drunken state and while in this condition to undertake tasks for which unqualified physically or mentally by alcohol", found that the veteran's injuries occurred "as a result of willful misconduct" and therefore disallowed his claim. R. at 28, 30. The veteran filed a Notice of Disagreement (NOD) in March 1989. R. at 33. A June 1989 RO decision found that "the veteran's act of attempted suicide, as it pertains to 38 C.F.R. [§] 3.302, is explainable and does not constitute unsoundness" in that "[i]t is reasonable to assume that the veteran attempted suicide in order to avoid the consequence of his act of double murder." R. at 48–49. The RO concluded that "the veteran was sane at the time he attempted suicide." R. at 49.

In August 1989, VA received private medical reports from May and June 1983 regarding the veteran's mental state at the time of the shooting. R. at 51–60. A May 1983 report from a private physician, Dr. Colbach, stated that the veteran had "no history of treatment for any kind of mental illness" and that there was "no evidence of any serious

mental illness, such as hallucinations or delusions." R. at 53. The report included a diagnostic impression that the veteran was "suffering from traumatic blindness and depression" and that he had "some elements of a dependent personality, in that he seem[ed] always to have been a rather insecure individual with a strong need to be accepted and [had a] special sensitivity to rejection." R. at 55. The report also stated the following:

At the time of the shooting on March 24, 1983, I think that he was suffering from an Adjustment Disorder with Mixed Emotional Features. Essentially this means that he was having a strong emotional reaction, mixed with anxiety and depression, to the breakup of the relationship with [his girlfriend]. He was very upset.... With the loss of his work and the loss of the most significant factor in his love life, [the veteran] became very despondent. He increased his alcohol intake and, in the hours before the shooting, feverishly sought out [his girlfriend] to try to bring about some kind of peace between them.... His final act of attempting suicide, of course, is another very obvious indicator of the extreme state of this man's emotions at the time of this shooting.

I think that he is able to aid and assist in his defense [of the crimes charged]. I don't think that he has a defense based on a lack of substantial capacity.

I do think, however, that he meets the major elements for a manslaughter defense based on extreme emotional disturbance.... From his point of reference I think this extreme emotional state is reasonable.

R. at 55–56.

A June 1983 report from Dr. Colbach stated that his opinions remained "essentially the same" as stated in his May 1983 report. R. at 58. The report noted that the veteran had a blood alcohol level of .102 at the time of his admission to St. Vincent's Hospital in Oregon, "perhaps a bit more than an hour after the shooting". R. at 59. The report also noted that Dr. Colbach thought that "the shooting took place primarily not because of the alcohol but because of [the veteran's] extreme emotional state." *Ibid.* In Septem-

ber 1989, VA received a March 1983 medical report from St. Vincent's Hospital which included a diagnosis of "(1) 0.22 caliber rifle injury to the head, portal of entry—right temple; portal of exit—left temple; (2) [i]njury to both optic nerves, resulting in blindness; (3) [d]amage to the temporal lobes and to the orbits as well as to the ethmoid and sphenoid sinuses." R. at 62–63. The report stated: "He is totally blind." R. at 62.

A November 1989 RO decision noted the reports from Dr. Colbach and confirmed the RO's June 1989 decision that the evidence of record did not show that the veteran was insane at the time he attempted suicide. R. at 66. The veteran filed a second "NOD" in March 1990. See R. at 71. In his June 1990 VA Form 1–9 (Substantive Appeal to the BVA), he stated that he was mentally unsound at the time of the event which had left him totally blind, that he had arrived at his girlfriend's house "just moments after she was killed", was "in a state of shock", and returned to his car where he "received the shot to the head which destroyed [his] eyesight". R. at 74–75.

A November 1990 BVA decision remanded the matter to the RO to determine whether the defense of insanity or diminished capacity, or a related defense, had been presented at trial, and, if so, to report the outcome of that action; and to submit a copy of the trial transcript, the court's judgment, and any psychiatric reports. The Board also remanded for the RO to readjudicate the issue without any consideration or application of 38 C.F.R. § 3.302, which it stated applied only in cases involving a claim for service connection. R. at 77–80.

In April 1991, the RO requested medical evidence from Dr. Colbach and evidence pertaining to the veteran's defenses at trial, the outcome, the trial transcript, and reports from the veteran's criminal trial attorney. R. at 82–83. Later that month, John Ray, Esq., the veteran's former attorney, wrote to the RO that "the trial ... began on June 14, 1983, and lasted through June 16, 1983, at which time [the veteran] elected to enter pleas of guilty to two counts of murder, which were lesser included offenses of the two counts of aggravated murder charged in the original indictment"; that during the trial the veteran presented evidence supporting his theory "that at the time of the alleged crimes, [the veteran] was acting under the influence of extreme emotional disturbance which, if believed, would have mitigated the crimes of aggravated murder to manslaughter in the first degree"; and that "[t]he defendant's decision to enter a plea of guilty to the lesser included charges of murder ... made this issue moot, and the jury was released without ever having to deliberate on the evidence pertaining to this partial defense." R. at 85–86. The attorney noted that he did not have a trial transcript or any of the psychiatric reports from Dr. Colbach. Ibid. A June 1983 Judgment Upon a Plea of Guilty entered in the veteran's criminal case was attached to the letter. R. at 89. The judgment stated that the veteran had pled guilty to the "crimes of murder (unclassified felony)", two counts, and had received a life sentence, with the possibility of parole in 10 years. R. at 89–90.

In July 1991, an RO decision on remand considered the additional information submitted by the veteran's former attorney and found that "the evidence d[id] not show [that] the veteran was insane when he shot himself and [that] his attorney did not plan to argue that he was insane". R. at 104. An August 1991 RO administrative decision found that it was "reasonable to assume that the veteran [had] attempted suicide in order to avoid the consequences of his act of double murder," and concluded that the veteran was not entitled to non-service-connected disability pension benefits. R. at 106–07. The RO issued a Supplemental Statement of the Case (SSOC) in September 1991, and identified the issues as "[s]anity" and the question: "Is the veteran permanently and totally disabled[?]". R. at 111–15.

An October 1991 letter from the veteran stated that he is a "totally blind veteran", that he had been shot 15 minutes after the crime, and that he "was not in a rational sta[t]e of mind when [he] shot [him]self". R. at 117–18. Apparently, in March 1992, the RO had determined that the veteran had not submitted new evidence or contentions. See R. at 125. In June 1992, the BVA noted that

the August 1991 RO decision had relied in part on the provisions of 38 C.F.R. § 3.302 despite the Board's previous remand instruction to the RO not to apply that provision. R. at 125. The Board again remanded the matter to the RO for it to review the information contained in a March 1990 habeas corpus petition filed with the U.S. Court of Appeals for the Ninth Circuit and submitted by the veteran to VA in October 1991, and to issue a new decision on whether the veteran's injuries were the result of his own willful misconduct and to do so without considering or applying 38 C.F.R. § 3.302.

In an August 1992 decision on remand, the RO noted that the veteran's March 1990 habeas corpus petition stated that "Dr. Colbach [had] evaluated the veteran, found a mental disorder had been 'present at the time of the shootings'" and that "this supported a defense of 'extreme emotional disturbance'" and that the petition "describe[d] the veteran's thought pattern in June 1983 as delusional" during his trial. R. at 129. The RO determined that "the evidence of record d[id] not show that the veteran was insane when he shot himself". *Ibid.* A January 1993 RO administrative decision concluded that the veteran was not entitled to non-service-connected pension benefits because his injuries were considered to be due to his own willful misconduct. R. at 131–32.

In the September 1993 BVA decision here on appeal, the Board denied entitlement to a permanent and total disability rating for pension purposes based on a finding that the veteran's March 24, 1983, injuries were due to his own willful misconduct under 38 U.S.C. § 1521(a), and 38 C.F.R. § 3.301(b). R. at 9. The Board stated that it could "find no support for a finding that his personality disorder can be considered a psychiatric disease leading to insanity". R. at 9. The Board also found that the veteran had "intended to kill himself as a means of escaping the mental anguish and/or criminal consequences resulting from the two murders". *Ibid.*

## II. Analysis

### A. *Generally Applicable Law*

As to entitlement to non-service-connected VA pension, 38 U.S.C. 1521 provides:

> (a) The Secretary shall pay to each veteran of a period of war who meets the service requirements of this section ... and who is permanently and totally disabled from non-service-connected disability not the result of the veteran's willful misconduct, pension at the rate prescribed by this section....

38 U.S.C. § 1521(a); *see* 38 C.F.R. § 3.314(b)(2) (1994) ("[d]eterminations of permanent total disability for pension purposes will be based on non-service-connected disability ... not the result of willful misconduct or vicious habits"); 38 C.F.R. § 3.301(b) (1994) ("[d]isability pension is not payable for any condition due to the veteran's own willful misconduct"); *see also* 38 C.F.R. § 3.3(a)(3) (1994); *Roberts v. Derwinski,* 2 Vet.App. 387, 389 (1992); *Hyder v. Derwinski,* 1 Vet.App. 221, 223 (1991). "Willful misconduct" is defined as "an act involving conscious wrongdoing or known prohibited action"; "[i]t involves deliberate or intentional wrongdoing with knowledge of or wanton and reckless disregard of its probable consequences" and must be "the proximate cause of injury, disease[,] or death." 38 C.F.R. §§ 3.1(n), (n)(1), (n)(3), 3.301(c) (1994).

Although "insanity" is not identified specifically as a defense to a finding of willful misconduct, VA regulations provide the following definition of the term:

> (a) *Definition of Insanity.* An insane person is one who, while not mentally defective or constitutionally psychopathic, ... exhibits, due to disease, a more or less prolonged deviation from his normal method of behavior; or who interferes with the peace of society; or who has so departed (become antisocial) from the accepted standards of the community to which by birth and education he belongs as to lack the adaptability to make further adjustment to the social customs of the community in which he resides.

38 C.F.R. § 3.354(a) (1994).

Section 3.302 of title 38, Code of Federal Regulations, entitled "*Service connection* for mental unsoundness in suicide" (emphasis added), provides:

(a) *General.* (1) In order for suicide to constitute willful misconduct, the act of self-destruction must be intentional.

(2) A person of unsound mind is incapable of forming an intent (mens rea, or guilty mind, which is an essential element of crime or willful misconduct).

(3) It is a constant requirement for favorable action that the precipitating mental unsoundness be *service connected.*

(b) *Evidence of mental condition.* (1) Whether a person, at the time of suicide, was so unsound mentally that he or she did not realize the consequence of such an act, or was unable to resist such impulse is a question to be determined in each individual case, based on all available lay and medical evidence pertaining to his or her mental condition at the time of suicide.

(2) The act of suicide or a bona fide attempt is considered to be evidence of mental unsoundness. Therefore, where no reasonable adequate motive for suicide is shown by the evidence, the act will be considered to have resulted from mental unsoundness.

(3) A reasonable adequate motive for suicide may be established by affirmative evidence showing circumstances which could lead a rational person to self-destruction.

(c) *Evaluation of evidence.* (1) Affirmative evidence is necessary to justify reversal of service department findings of mental unsoundness where [VA] criteria do not otherwise warrant contrary findings.

(2) In all instances any reasonable doubt should be resolved favorably to support a finding of *service connection* (see § 3.102).

38 C.F.R. § 3.302 (1994) (boldface emphasis added). VA regulations contain no provisions purporting to establish comparable guidance, or any guidance, for consideration of suicide or attempted suicide explicitly for purposes of non-service-connected benefits.

■ The Board is required to provide a written statement of reasons or bases for its findings and conclusions on all material issues of fact and law presented on the record. *See* 38 U.S.C. § 7104(d)(1). The statement must be adequate to enable a claimant to understand the precise basis for the Board's decision, as well as to facilitate review in this Court. *See Simon v. Derwinski,* 2 Vet.App. 621, 622 (1992); *Masors v. Derwinski,* 2 Vet. App. 181, 188 (1992); *Gilbert v. Derwinski,* 1 Vet.App. 49, 57 (1990). To comply with this requirement, the Board must analyze the credibility and probative value of the evidence, account for the evidence which it finds to be persuasive or unpersuasive, and provide the reasons for its rejection of all material evidence favorable to the veteran. *See Caluza v. Brown,* 7 Vet.App. 498, 506 (1995); *Gabrielson v. Brown,* 7 Vet.App. 36, 39–40 (1994); *Gilbert, supra.*

■ Moreover, the Board "may consider only independent medical evidence to support [its] findings". *Colvin v. Derwinski,* 1 Vet. App. 171, 175 (1991); *see Thurber v. Brown,* 5 Vet.App. 119, 122 (1993); *Hatlestad v. Derwinski,* 3 Vet.App. 213, 217 (1992) (*Hatlestad II* ). "If the medical evidence of record is insufficient, or, in the opinion of the BVA, of doubtful weight or credibility, the BVA is always free to supplement the record by seeking an advisory opinion, ordering a medical examination or [quoting] recognized treatises". *Colvin, supra; see Hatlestad II, supra; see also* 38 U.S.C. § 7109, 38 C.F.R. § 20.901(a), (d) (1994).

■ The Court reviews BVA factfinding under a "clearly erroneous" standard; "if there is a 'plausible' basis in the record for the factual determinations of the BVA, ... [the Court] cannot overturn them". *Gilbert,* 1 Vet.App. at 53; 38 U.S.C. § 7261(a)(4).

### B.  Application of Law to Facts

The veteran has qualifying service for purposes of basic eligibility for VA non-service-connected pension under 38 U.S.C. § 1521(a). The issue before the Court is whether his non-service-connected disability was the result of willful misconduct. The Court notes that the BVA did not address whether the veteran's disability—total blindness—causes him to be permanently and totally disabled. *See* 38 U.S.C. § 1521(a). The Court will not need to address that question either.

The appellant contends that Dr. Colbach's May 1983 report stated that at the time of the injury the appellant "went through an extreme emotional disturbance" and thus was not acting in a rational manner and was temporarily insane at that time. Brief (Br.) at 3. The Secretary argues that the Board properly denied the veteran's claim because the evidence of record demonstrates that he was not insane at the time he incurred his injuries in a suicide attempt and thus that the injuries were the result of his own willful misconduct. Br. at 7. The Secretary contends that the Board appropriately did not address 38 C.F.R. § 3.302 because this case involves entitlement to a permanent and total disability rating for pension purposes and the regulation involves entitlement only to service connection. Br. at 10–11.

In its September 1993 BVA decision, the Board denied entitlement to a permanent and total disability rating for VA pension purposes based on a finding that the veteran's March 24, 1983, injuries were due to his own willful misconduct under 38 U.S.C. § 1521(a) and 38 C.F.R. § 3.301(b). R. at 9. The Board found that on March 24, 1983, "the veteran [had] shot himself in the head resulting in blindness in both eyes", that under 38 C.F.R. § 3.1(n) the "act of shooting himself in the head was done with wanton and reckless disregard of the probable consequences", and that under 38 C.F.R. § 3.354 he "was not suffering from an acquired psychiatric disease" and thus was not "insane when he shot himself". R. at 6, 8. In applying 38 C.F.R. § 3.354, the Board stated that the regulation implied that a finding of insanity must be "predicated on the existence of a medically demonstrated psychiatric disease". R. at 7.

■ Because "willful misconduct" requires an intentional act under 38 C.F.R. § 3.1(n), and because intent presupposes sufficient mental capacity at the time of the act to understand its nature, the Court agrees with the Board's conclusion that, although no VA regulation expressly so provides, "insanity, if proven, will constitute a viable defense under VA law to a charge of 'willful misconduct'." R. at 7. The Court concludes that if the veteran had been insane at the time of

the injury then he could not have formed "the intent necessary to carry out" a "deliberate or intentional" act. R. at 7; 38 C.F.R. § 3.1(n)(1); cf. United States v. Brawner, 471 F.2d 969, 991 (D.C.Cir.1972) (en banc) (adopting Model Penal Code definition of insanity that an insanity defense in criminal prosecutions may be based either on mental disease or on mental defect, provided there is sufficient causal link between defendant's mental disease or defect, and his inability to control his behavior, and also requiring that defendant show that his behavior controls were impaired to such an extent that he "lack[ed] substantial capacity to appreciate that his conduct [was] wrongful" or that he "lack[ed] substantial capacity to conform his conduct to the law"); United States v. Childress, 58 F.3d 693, 727–730 (D.C.Cir.1995) (explaining holding in Brawner that expert testimony about an abnormal mental condition is admissible when specific-intent crime is charged if "it is relevant to negate, or establish, the specific mental condition that is an element of the crime"). Accordingly, the Court holds that the definition of insanity provided in 38 C.F.R. § 3.354(a) is applicable in this case to determine whether the attempted suicide by the appellant constituted willful misconduct.

■ Turning to the interpretation of the regulation, the Court finds that § 3.354(a), although less than clear given its obvious drafting defects, must be interpreted so as to avoid an absurd result. "The canons of construction of course apply equally to any legal text and not merely to statutes." Smith (William A.) v. Brown, 35 F.3d 1516, 1522–24 (Fed.Cir.1994) (interpreting language of 38 C.F.R. § 3.105(a), Court analyzed words in light of terms surrounding it, structure of regulation, and textual context of whole regulation) (citing Black & Decker Corp. v. Commissioner of Internal Revenue, 986 F.2d 60, 65 (4th Cir.1993) ("Regulations, like statutes, are interpreted according to the canons of construction")). "Determining a statute's plain meaning requires examining the specific language at issue and the overall structure of the statute." Gardner v. Derwinski, 1 Vet.App. 584, 586 (1991) (citing Bethesda Hospital Ass'n v. Bowen, 485 U.S. 399, 403–

05, 108 S.Ct. 1255, 1258–59, 99 L.Ed.2d 460 (1988)), *aff'd sub nom. Gardner v. Brown*, 5 F.3d 1456 (Fed.Cir.1993), *aff'd*, —— U.S. ——, 115 S.Ct. 552, 130 L.Ed.2d 462 (1994). "[W]hen a reviewing court 'find[s] the terms of a statute unambiguous, judicial inquiry is complete except in rare and exceptional circumstances.' " *Smith (Edward F.) v. Derwinski*, 2 Vet.App. 429, 431 (1992) (quoting *Demarest v. Manspeaker*, 498 U.S. 184, 111 S.Ct. 599, 112 L.Ed.2d 608 (1991)). The "plain meaning must be given effect unless a 'literal application of [the] statute will produce a result demonstrably at odds with the intention of its drafters.' " *Gardner*, 1 Vet. App. at 586–87 (quoting *Griffin v. Oceanic Contractors, Inc.*, 458 U.S. 564, 102 S.Ct. 3245, 73 L.Ed.2d 973 (1982)). The "absurd result" exception to the plain meaning rule is narrow and limited to situations "where it is quite impossible that Congress could have intended the result ... and where the alleged absurdity is so clear as to be obvious to most anyone." *Gardner*, 1 Vet.App. at 587 (quoting *Public Citizen v. U.S. Department of Justice*, 491 U.S. 440, 470–71, 109 S.Ct. 2558, 2575, 105 L.Ed.2d 377 (1989) (Kennedy, J., concurring)).

■ As written, the regulation appears to provide for three independent instances of insanity. An insane person is (1) "one who ... exhibits, due to disease, a more or less prolonged deviation from his normal method of behavior"; (2) one "who interferes with the peace of society"; or (3) one "who has so departed ... from the accepted standards of the community to which by birth and education he belongs as to lack the adaptability to make further adjustment to the social customs of the community in which he resides." 38 C.F.R. § 3.354. As constructed, with its placement of the term "who" once before *and* twice after the phrase "due to disease", the second and third prongs of VA's regulation, read literally, would define an insane person as one who merely "interferes with the peace of society" (second clause) or one who merely exhibits antisocial behavior (third clause). The appellant contends just that in his brief, asserting that "[a] person who deviates from their normal behavior and causes a public disturbance due to unfore-

seen actions can be placed in ... a temporary insane state of mind." Br. at 1.

The Court concludes that a literal interpretation of the regulation would produce an illogical and absurd result that could not have been intended by the Secretary. The only way to read § 3.354(a) so as to avoid such a result is to apply the phrase "due to a disease" to all three circumstances provided for in the regulation. *See Gardner* and *Smith (E.F.)*, both *supra*. A review of the regulatory history as published in the Federal Register fails to reveal any direct evidence of the intent underlying the wording of the definition. *See* 26 Fed.Reg. 1,561, 1,589 (1961) (replacing part 3 of title 38, Code of Federal Regulations, with a new one); 15 Fed.Reg. 5,908 (1950) (adding cross reference); 13 Fed.Reg. 7,030 (1948) (renumbering regulation).

However, the following examination of the evolution of the current regulation provides inferential support for the Court's interpretation. Section 3.354(a) was previously codified at 38 C.F.R. § 2.1174 (1938), and the earlier regulation (as well as the version later relocated verbatim to § 3.174 in the 1957 Code of Federal Regulations) contained the following definition of both insanity and incompetency (and was so titled):

> For general purposes an insane person or lunatic may be defined as one who, while not mentally defective or constitutionally psychopathic, ... exhibits, due to disease, a more or less prolonged deviation from his normal method of behavior, *and who* is thereby rendered incapable of managing his own affairs or transacting business with ordinary prudence; *or who* is dangerous to himself, to others, or to property; *or who* interferes with the peace of society; *or who* has so departed (become antisocial) from the accepted standards of the community to which by birth and education he belongs as to lack the adaptability to make further adjustment to the social customs of the community in which he resides.

38 C.F.R. § 2.1174 (1938) (emphasis added).

When the regulation was recodified at § 3.354(a) as part of a general recodification of part 3 in 1961, the material regarding incompetency (immediately following the em-

phasized "and") was excised and moved in part to a definition of incompetency at 38 C.F.R. § 3.353(a) ("one who because of injury or disease lacks the mental capacity to contract or to manage his own affairs"). 26 Fed.Reg. 1,589 (1961). (This definition of incompetency continues at § 3.353(a) in essentially the same form. 38 C.F.R. § 3.353(a) (1994).) The 1961 removal of the word "and" from the 1938 (and 1957) version created the drafting defect and potentially absurd result noted by the Court today, because the 1938 version had established a definition of insanity which required that an individual to be insane must "exhibit[ ], *due to disease,* [certain deviant behavior] ... *and* " be one who is financially incompetent; "*or* who interferes with the peace of society; *or* who" is socially inadaptable. 38 C.F.R. § 2.1174 (1938) (emphasis added). The Court is satisfied that the above regulatory history demonstrates no VA intention to produce the absurd result that a literal reading of the regulatory definition would entail.

### C. Standard of review and its application

In *Cropper v. Brown,* 6 Vet.App. 450 (1994), the Court held that the issue of willful misconduct is a question of fact to be reviewed by the Court under the "clearly erroneous" standard in 38 U.S.C. § 7261(a)(4). *See Gilbert, supra.* Because a determination of whether a person is insane is in effect a determination of whether that person's actions were intentional and thus the result of willful misconduct, the Court today holds that the insanity determination should also be considered a question of fact subject to review by the Court on the same "clearly erroneous" standard. The two questions are inextricably intertwined; a finding of insanity would negate willful misconduct. *See Brawner, supra.*

In reviewing, under the "clearly erroneous" standard, the Board's finding that the veteran's injuries were due to his own willful misconduct and not due to insanity, the Court holds, for the following reasons, that the record provides a plausible basis for the Board's findings, and the Court will therefore affirm the Board's decision.

When the issue involves medical diagnosis or etiology, competent medical evidence is required. *See Lathan v. Brown,* 7 Vet.App. 359, 365 (1995) (citing *Grottveit v. Brown,* 5 Vet.App. 91, 93 (1993)). The medical evidence of record includes Dr. Colbach's May 1983 examination report which shows that the veteran was under extreme emotional distress when he shot himself. The report stated that the veteran had "no history of treatment for any kind of mental illness" and that there was "no evidence of any serious mental illness, such as hallucinations or delusions". R. at 53. The report stated that the veteran had "some elements of a dependent personality" and that at the time of the shooting "he was suffering from ... a strong emotional reaction, mixed with anxiety and depression, to the breakup of the relationship with [his girlfriend]"; that he had become "very despondent" because of "the loss of his work and the loss of the most significant factor in his love life"; and that his suicide attempt had been "another very obvious indicator of the extreme state of this man's emotions". After having examined the veteran at the request of the veteran's former criminal trial attorney, Dr. Colbach did not "think that [the veteran] ha[d] a defense based on a lack of substantial capacity". R. at 55–56. The June 1983 report from Dr. Colbach stated his opinion that "the shooting took place primarily not because of the alcohol but because of [the veteran's] extreme emotional state." R. at 59.

The only evidence of record indicating that the veteran was insane at the time of the injury is his own assertion that he was temporarily insane. This lay assertion is not competent medical evidence. *See Moray v. Brown,* 5 Vet.App. 211 (1993); *Espiritu v. Derwinski,* 2 Vet.App. 492, 494–95 (1992). Because there is no medical evidence of record indicating that the veteran suffered from insanity due to a "disease", as the Court has concluded is required under 38 C.F.R. § 3.354(a), or that he did not know or understand the nature or consequences of his act or that what he was doing was wrong, or evidence that could otherwise support a finding of insanity, *see Brawner, supra,* the Board's finding that the veteran was not

insane at the time he was shot is thus not subject to reversal as clearly erroneous.

### D. 38 C.F.R. § 3.302

In reaching its determination, the Board did not apply 38 C.F.R. § 3.302, and, based on its previous decisions in this case specifically instructing the RO on remand not to consider that regulation, it seems clear that the Board intentionally did not apply that regulation. Although that section provides the only regulatory guidance relevant to the issue of whether a veteran's suicide attempt constitutes willful misconduct, the Court notes that it seems to apply on its face to a claim for service connection, not to a claim for non-service-connected benefits, including pension. However, the Court notes as well that, even if that regulation were applicable to a pension claim, in this case the basis for the Board's finding that the veteran "intended to kill himself as a means of escaping the mental anguish and/or criminal consequences resulting from the two murders" (R. at 9) would satisfy the § 3.302(b)(2) criterion of a "reasonable adequate motive" for the suicide attempt would not be clearly erroneous under 38 U.S.C. § 7261(a)(4), and thus the presumption established by § 3.302 under *Sheets v. Derwinski*, 2 Vet.App. 512, 516 (1992), would not apply. On either analysis, the Board made no error with respect to § 3.302.

### III. Conclusion

Upon consideration of the record, the appellant's informal brief, and the Secretary's brief, the Court holds that the appellant has not demonstrated that the BVA committed error—in its findings of fact, conclusions of law, procedural processes, articulation of reasons or bases, or application of the benefit-of-the-doubt rule—that would warrant remand or reversal under 38 U.S.C. §§ 5107(a),(b), 7104(a),(d)(1) and the analysis in *Gilbert, supra.* Therefore, the Court affirms the September 3, 1993, BVA decision.

AFFIRMED.

### IV. Separate Views

The author judge notes that the Court's discussion of 38 C.F.R. §§ 3.302 and 3.354 illustrates still another "confusing tapestry"

of VA regulations which should be the subject of review and reevaluation by the Secretary with a view toward providing clear guidance for the adjudication of VA benefits claims. This Court has had not infrequent occasion to call to the Secretary's attention the need for reevaluation of VA regulations on a wide variety of subjects. *See, e.g., Hatlestad v. Derwinski,* 1 Vet.App. 164, 167 (1991) (as to unemployability for compensation purposes involving· 38 C.F.R. §§ 3.340, 3.341, 4.16, 4.18, and 4.19); *Karnas v. Derwinski,* 1 Vet.App. 308, 311 (1991) (as to standards set forth in §§ 4.16(c), 4.129, and 4.132, Diagnostic Code (DC) 9210); *Talley v. Derwinski,* 2 Vet.App. 282, 285–86, 288 (1992) (as to unemployability for pension purposes involving §§ 3.321(b)(2), 3.340(a)(1),(b), 3.342(b), 4.15, and 4.17); *Brown v. Derwinski,* 2 Vet.App. 444, 447 (1992) (same); *Ledford v. Derwinski,* 3 Vet.App. 87, 89 (1992) (as to service connection for impaired hearing under § 3.385); *Hill v. Principi,* 3 Vet. App. 540, 541 (1992) (implicitly as to § 4.71(a), DCs 5216 to 5226); *Hood v. Brown,* 4 Vet.App. 301, 304 (1993) (as to § 4.132, DC 9210); *Austin v. Brown,* 6 Vet. App. 547, 553–54 (1994) (as to §§ 19.9, 20.901; BVA Chairman's Memo No. 01–91–21; and VA General Counsel opinion 16–92); *Shipwash v. Brown,* 8 Vet.App. 218, 224–25 (1995) (as to § 4.71a, DCs 5216 to 5227). Yet it would appear that VA remedial regulatory action has been taken in only one such area (service connection for impaired hearing, *see* 58 Fed.Reg. 48,483 (1993) (proposed rule now codified at 38 C.F.R. § 3.385 by amendment in 59 Fed.Reg. 60,560 (1994)). *See Ledford, supra; cf.* 59 Fed.Reg. 62,584 (1994) (final rule to amend 38 C.F.R. § 3.807 to reflect Court's determination in *Kimberlin v. Brown,* 5 Vet.App. 174, 175 (1993), regarding eligibility for dependents' educational assistance in cases where veteran's permanent and total service-connected disability has been established); 58 Fed.Reg. 28,808 (1993) (proposed rule to amend 38 C.F.R. § 4.31 to eliminate perceived discrepancy between VA practice and regulation with respect to assignments of zero percent evaluation where not specifically authorized, as discussed in *Rabideau v. Derwinski,* 2 Vet.App. 141, 143

(1992), now codified at § 4.31 by amendment in 58 Fed.Reg. 52,018 (1993)).

According to VA's General Counsel, an effort is underway in her office to review all VA regulations, and, where indicated, propose revisions. *See* Statement of Mary Lou Keener, Third Annual Judicial Conference, U.S. Court of Veterans Appeals, 8 Vet.App. XLV, LVII (Oct. 17, 1994) (noting that it was "time to take a serious look at VA law and reg[ulation]s and fix them if they're broke[n]"); Statement of Mary Lou Keener before Senate Committee on Veterans' Affairs (June 8, 1995) ("[s]ince March 23, 1995, VA has been undertaking a line-by-line review of [VA's] regulations in title 38 of the Code of Federal Regulations ... in response to the March 4, 1995, President's directive that all of the departments and agencies of the Executive Branch review their regulations to determine if they can be streamlined"). Perhaps this review will produce tangible results to clarify the regulations involved in the instant case as to insanity and mental unsoundness in suicide, and as to those regulations involved in the above cited cases in which the Court has previously suggested a need for reevaluation.