# UNITED STATES COURT OF APPEALS FOR VETERANS CLAIMS

No. 97-1884

ROBERT A. BECK, APPELLANT,

V.

TOGO D. WEST, JR.
SECRETARY OF VETERANS AFFAIRS, APPELLEE.

On Appeal from the Board of Veterans' Appeals

(Decided  June 27, 2000 )

*J. Mitchell Lanier*, of Moncks Corner, South Carolina, was on the pleadings for the appellant.

*Leigh A. Bradley*, General Counsel; *Ron Garvin*, Assistant General Counsel; and *Carolyn F. Washington*, Deputy Assistant General Counsel, all of Washington, D.C., were on the pleadings for the appellee.

Before NEBEKER, *Chief Judge*, and KRAMER and HOLDAWAY, *Judges.*

NEBEKER, *Chief Judge*:  The appellant, Robert A. Beck, appeals from a June 25, 1997, Board of Veterans' Appeals (Board or BVA) decision that denied as not well grounded his reopened claim of service connection for a psychiatric disorder.  Based on the parties' briefs and the record on appeal, the Court will vacate the Board's decision denying Mr. Beck veteran status for his second period of service, and remand for readjudication of the matters of his eligibility for VA benefits and his claim for service connection.

## I.  FACTS

Mr. Beck had two periods of service in the U.S. Army.  He received an honorable discharge from the first period, which extended from January 18, 1971, to January 18, 1974. Record (R.) at 22. His second period, from May 2, 1974, to January 12, 1976, was terminated under other than honorable (OTH) conditions.  R. at 23.  Charges against him during the latter period (for which he accepted the OTH discharge in lieu of special court-martial proceedings) included disobeying a

lawful order (on two occasions in September 1974), failing to report at the prescribed time to his appointed place of duty in October 1975, and two periods of several days' absence without leave (AWOL) during November and December 1975. R. at 107, 109, 110. In executing a "Request for Discharge for the Good of the Service," he acknowledged that he had committed a serious offense and that he had no excuse for being AWOL, but wrote that he had "reasons." R. at 114. He stated that he had "severe family problems," and that he "would do whatever it takes" to be reunited with his wife and daughter. *Id*. He had, in fact, gone to the trailer home where his wife and daughter were living, and his first AWOL period ended when he was located there after a neighbor complained of a disturbance. R. at 107. He voluntarily returned to his unit to end his second AWOL period. R. at 107.

His service medical records (SMRs) from his first period of service showed no significant medical problems, either physical or mental; however, a medical report from that period noted a history of head injury, dizziness or fainting spells, and problems with teachers. R. at 26-29. On his reenlistment report of medical history, prepared in April 1974, the box labeled "nervous trouble of any sort" is checked and the physician's summary section of the report states, "[T]reated for nervous age 10 [sic]." R. at 66-67. SMRs dated in October 1975 reflected that Mr. Beck had complained of having insomnia for a period of four weeks, feeling nervous, and being jittery; he was diagnosed with anxiety. R. at 80. The mental status evaluation conducted prior to separation from his second period of service indicated that (1) the examiner noted no significant mental illness; (2) Mr. Beck was mentally responsible; (3) he was able to distinguish right from wrong; (4) he was able to adhere to the right; and (5) he had the mental capacity to understand and participate in board proceedings. R. at 62.

Following Mr. Beck's discharge, a VA administrative decision, dated in November 1976, determined that he was entitled to VA benefits for his first period of service; it further determined that he was barred from VA benefits for his second period of service. R. at 90. In April 1977, during a VA hospitalization, he was diagnosed with acute and undifferentiated schizophrenia. R. at 92-93. During a VA hospitalization from January 1978 to March 1978, the diagnosis was "schizophrenia, chronic undifferentiated type." R. at 307. In July 1978, Mr. Beck was hospitalized

at the South Carolina State Hospital and his treating physicians recorded a diagnostic impression of schizophrenia, paranoid type. R. at 132-33.

In January 1979, Dr. Wayne Braverman wrote that the appellant was severely disabled and that he had probably been so for the "past three or four years." R. at 125, 296. In March 1980, Dr. P. Richard Gunter noted that although the appellant did not elaborate as to exactly when his psychiatric difficulties began, he did state that when he was in the Army he once went AWOL because he had a vision that his daughter was being "placed out on the street." R. at 294. In June 1980 Mr. Beck filed an initial application for service connection for "insomnia-anxiety and paranoid schizophrenia." R. at 137. The claim was denied. *Id*. Stated as the basis for the denial was the lack of evidence of a nervous condition during the appellant's first period of service, and the presence of "evidence to show onset" during the period from which he received the OTH discharge. *Id*. He did not appeal (R. at 214), but continued to exhibit symptoms of a serious psychiatric disorder. *See, e.g.,* R. at 143. In February 1981, the Social Security Administration concluded that the appellant had been disabled since July 1978 and granted disability benefits. R. at 244. In 1993, Mr. Beck attempted to reopen his VA claim for service connection. Dr. Raul Paez wrote to VA on his behalf, stating that Mr. Beck's symptoms prior to discharge from service were, in fact, the onset of his illness which was diagnosed in April 1977. R. at 151. Mr. Beck provided sworn testimony at a VA personal hearing in October 1993. R. at 182-93.

In March 1996, the Board determined that the claim had been reopened and remanded it for further development, including a psychiatric examination. R. at 213-20. Specifically, the BVA's remand directed the VA regional office (RO) to obtain copies of all of Mr. Beck's treatment and social security claim records. These documents were to be associated with the claims folder. Once this had been done, the Board directed the following:

> The veteran should be afforded a VA psychiatric examination to determine the current extent and likely etiology of his chronic schizophrenia. All necessary testing in this regard should be accomplished. The claims folder should be made available to the examiner for review. Based on his/her review of the case, it is requested that the examiners express an opinion as to the medical probability that any currently demonstrated schizophrenia was present during the veteran's second period of military duty from May 2,

3

> 1974[,] to January 12, 1976, as claimed by the veteran. The opinion
> should contain complete reasons or bases for the conclusions reached.

R. at 217-18 (emphasis in original). Once the records and examination were complete, the RO was to make a de novo adjudication, which if adverse to Mr. Beck, was to trigger issuance of a supplemental statement of the case, with opportunity to respond, and ultimately return of the matter to the Board. *Id.*

In his June 1996 report of the BVA-directed psychiatric examination, the VA examiner (identified as "T. Gardner" (R. at 225)) stated that Mr. Beck was suffering from a schizo affective disorder that began with the initial "break" in September 1975 that led Mr. Beck to see a doctor in October 1975. R. at 229. The examiner opined that the reason for the appellant's AWOL was his schizophrenia's manifestation with extreme paranoia and extreme thought disorder symptomatology. R. at 230. The examiner further concluded that the veteran's symptoms had been present "continuously" since October 1975. R. at 231. He stated, "In other words, this is the same illness that was present in 1975." *Id.* He referred to the initial, honorable three-year period of service, and concluded, "It is unlikely that a person who served for three years without problems would suddenly [go] AWOL without reason. The reasons in my opinion are clearly schizophrenia manifesting itself with extreme paranoia and extreme thought disorder symptomatology." R. at 230. He also stated that Mr. Beck's failure in 1975 to reveal to the Army doctor his "strange unusual thoughts that he was having [was based on] his fear that the doctor would think that he [was] unfit for duty." R. at 229-30. The examiner characterized this behavior as "a common reaction" of people with Mr. Beck's level of paranoia and thought disorder. R. at 230.

In September 1996, the RO denied service connection for schizophrenia, concluding that Mr. Beck was not insane at the time he went AWOL. R. at 375-76. In the decision now on appeal, the Board concluded that Mr. Beck had submitted evidence adequate to reopen his claim, but that upon review of the record as a whole, the claim was not well grounded. R. at 3. The Board found that no competent evidence had been submitted that the appellant was insane at the time of his AWOL offenses, or that his currently demonstrated paranoid schizophrenia was due to disease or injury that occurred in or was aggravated by service. R. at 16. This appeal followed.

4

## II. ANALYSIS

The threshold determination in this matter is whether Mr. Beck is a "veteran" who is eligible for VA benefits for any condition incurred during his second period of military service. 38 U.S.C. § 101(2); *see Holmes v. Brown*, 10 Vet.App. 38, 40 (1997). The term "veteran" is defined under section 101(2) as someone who has served "in the active military, naval, or air service and who was discharged or released therefrom under conditions other than dishonorable." Under 38 C.F.R. § 3.12(d)(4) (1999), a discharge under OTH conditions for willful and persistent misconduct will render a claimant ineligible for veterans benefits. *See Struck v. Brown*, 9 Vet.App. 145 (1996). A disability claim that was previously the subject of a final denial based on the character of the claimant's discharge is subject to reopening under 38 U.S.C. § 5108. *D'Amico v. West*, 209 F.3d 1322, 1326-27 (Fed. Cir. 2000), *vacating* 12 Vet.App. 264 (1999). Accordingly, the BVA did not err when it addressed Mr. Beck's claim as an attempt to reopen, and deemed the claim reopened based on the presentation of new and material evidence in the form of hearing testimony and the 1993 report of Dr. Paez. R. at 151, 182-93, 215.

Mr. Beck does not dispute VA's conclusion that the acts that led to his accepting the OTH discharge in lieu of court-martial proceedings are, on their face, the type of acts that constitute "willful and persistent misconduct." However, pursuant to 38 U.S.C. § 5303(b) and its implementing regulation, 38 C.F.R. § 3.354(b) (1999), a service member who is insane at the time of the acts that led to an OTH discharge retains eligibility for veterans benefits. He argues that the record demonstrates that he was insane at the time of these acts and, thus, should retain his eligibility for benefits, including service connection, because symptoms and behavior manifested during service were the early manifestation of his current psychiatric disorder. *See Zang v. Brown*, 8 Vet.App. 246, 252-54 (1995) (existence of insanity, as defined in section 3.354(a), at time of commission of act, negates intent so as to preclude act from constituting willful misconduct under section 3.1(n)).

> Section 3.354(a) defines an "insane person" as one who
>
> exhibits, due to disease, a more or less prolonged deviation from his normal method of behavior; or who interferes with the peace of society; or who has so departed. . . from the accepted standards of the community . . . to which he belongs as to lack the

5

adaptability to make further adjustment to the social customs of the community in which he resides.

*Id.*

If VA determines that, at the time of the commission of an offense that led to an OTH discharge, the claimant was "insane," that person is not precluded from an award of VA benefits based on that period of service. The definition of insanity in section 3.354(a) is broad. Mental illness is not identical to "insanity," and there need be no causal connection between the insanity and the misconduct. *See Zang, supra.* The acts leading to the discharge and the insanity must, however, be concurrent. *Id.; Stringham v. Brown*, 8 Vet.App. 445, 448 (1995). The determination whether insanity existed at the relevant time is factual, and the Court reviews the Board's determination under the "clearly erroneous" standard. *Id.* at 448-49. The Court will not overturn a factual determination of the BVA if there is a plausible basis in the record to support it, and it is supported by an adequate statement of reasons or bases for rejecting evidence favorable to the claimant. 38 U.S.C. § 7104(d)(2); *Gilbert v. Derwinski*, 1 Vet.App. 49, 53, 56-57 (1990).

Before reaching this factual determination, however, where a claim has been reopened, the Secretary must determine whether the claim is well grounded. *See Elkins v. West*, 12 Vet.App. 209 (1999); (en banc) *Winters v. West*, 12 Vet.App. 203, 208 (1999) (en banc). Here, the Board, in essence, concluded that the claim of service connection was not well grounded because Mr. Beck had not established "veteran" status during his second period of service "by submitting competent medical evidence that he was insane at the time of his AWOL offenses." R. at 2-3, 17.

The ultimate conclusion whether a claim is well grounded is a question of law. *See Hensley v. West*, __ F.3d __,__, slip op. at 13-14, No. 99-7029 (May 12, 2000). The underlying elements of a well-grounded claim involve "factual matters the determination of which by the agency fact-finders is entitled on review to substantial deference." *Id.* at 15. As the Court held in *Caluza v. Brown*, for a claim to be well grounded, there generally must be (1) medical evidence of a current disability; (2) medical, or, in certain circumstances, lay evidence of a disease or injury in service; and (3) medical evidence of a nexus between the asserted in-service injury or disease and the current disability. 7 Vet.App. 498, 596 (1995), *aff'd*, 78 F.3d 694 (Fed. Cir. 1996) (table).

Mr. Beck indisputably meets the first criterion: he currently has a serious psychiatric disorder. Moreover, medical evidence in the record, which links conduct during service to both his OTH

discharge and his present psychiatric condition, satisfies the second and third elements of a well-grounded claim under *Caluza.*

The BVA discounted the medical opinions favorable to Mr. Beck for four reasons. First, no medical opinion contemporaneous with the offenses diagnosed the disorder. R. at 12-13. Second, the October 1975 Mental Status Examination report noted "no complaints" and that Mr. Beck reported he was "feeling well." R. at 15. Third, the Board emphasized, in 1980 a psychiatric examiner had described Mr. Beck as being "considered a poor historian" who "related his psychiatric history in a very poor manner"; and, according to the Board, the examiners who opined that his going AWOL in service was the early manifestation of his present psychiatric disorder "did not have the benefit of first-hand clinical evaluation of symptomatology proximate to the time of the events," and based conclusions on Mr. Beck's--the "poor historian's"--account of his own symptoms. R. at 14-16. The BVA concluded that "the *only* evidence of record indicating that the appellant was insane at the time he had committed the AWOL offenses are his own assertions of having had paranoid feelings." R. at 16 (emphasis added). Fourth, citing Struck, *supra*, the BVA concluded that the medical opinions favorable to Mr. Beck were "incompetent" and that his claim was, accordingly, not well grounded because he had not submitted competent medical evidence to support his claim for veteran status. R. at 2-3, 16; *see Struck*, 9 Vet.App. at 155-56 (BVA did not err in rejecting, on the merits, as incompetent single favorable medical opinion by private physician where opinion was based on history provided by Mr. Struck and on other secondary sources, where history was demonstrably inaccurate as to key fact, and where physician had not reviewed relevant material in claims file).

The threshold for a well-grounded claim is "unique and uniquely low." *Hensley,* __ F.3d at __, slip op. at 11. The claim need only be "plausible." *Id*. at __, slip op. at 12. As the relevant "statutes, rules, and cases" make clear, in determining whether a claimant has met the requisite threshold, VA "must accept as true" the evidence submitted in support of a claim "[except] when the evidentiary assertion [other than in a government record] is inherently incredible or when the fact asserted is beyond the competence of the person making the assertion." *Id*. at __, slip op. at 13-14 (citing *Robinette v. Brown*, 8 Vet.App. 69, 75-76 (1995)).

Here, the Board in its March 1996 remand decision concluded that Mr. Beck's claim had been reopened based on Dr. Paez's opinion "that the veteran's schizophrenia began in service." R. at 216.

7

On remand to the RO, it issued specific instructions to the VA examiner to conduct "[a]ll necessary testing" of Mr. Beck, to review the claims folder, and to express an opinion on "the current extent and likely etiology of [Mr. Beck's] chronic schizophrenia." R. at 218-19. He was to provide an opinion, supported by adequate reasons or bases, as to whether the currently demonstrated schizophrenia was present during Mr. Beck's second period of military service. *Id*. The examiner opined that schizophrenia was present, and that Mr. Beck's going AWOL was the early manifestation of the schizophrenia diagnosed shortly after service. R. at 229-30. The BVA referred to these conclusions in the examination report, but concluded that the report was "incompetent" as evidence.

The report is favorable to Mr. Beck's claim. In its analysis, the Board stated that its "crucial determination . . . is whether the appellant has presented competent medical evidence that he was insane at the time of his AWOL offenses." R. at 13. The BVA also noted that it "is not required to accept the appellant's evidence and is entitled to weigh the credibility of that evidence." R. at 14. It concluded that "the VA examiner's diagnosis was based on the appellant's report of paranoia, thought insertion, auditory hallucinations with command thoughts and voices to hurt himself and others that [led] to nervousness and insomnia [for] which he had gone to see a doctor in October 1975." R. at 15. The Board summarized its evaluation of the favorable medical evidence as follows: "In fact, the only evidence of record indicating that the appellant was insane at the time he had committed the AWOL offenses are his own assertions of having had paranoid feelings." R. at 16.

The Court holds that the Board impermissibly analyzed the weight and credibility of the medical reports at the threshold stage of determining whether Mr. Beck's claims were well grounded. In its recent precedential decision in *Hensley, supra*, the U.S. Court of Appeals for the Federal Circuit held that the elements underlying a determination of whether a claim is well grounded are factual findings, but cited with approval this Court's holding concerning the presumption of credibility for favorable evidence at this pre-merits stage. __ F.3d at __, slip op. at 13-14. Here, the Board failed to apply the presumption.

The Court also notes that, even if the BVA had been reviewing the case on the merits, it failed to address statements in the VA examiner's report that were incontestably based on material other than Mr. Beck's own assertions. For example, under "Psychiatric History," the examiner states, "There is a report from the discharge summary [from a 1977 hospitalization at the Charleston VA

8

Hospital] that lists numerous outbursts of anger, including those requiring jail, anxiety, fear and inability to care for himself for the period immediately following his discharge from the United States Army." R. at 225. The examiner also states, "His first psychiatric symptoms actually appeared in October of 1975 and are documented in his C-file." *Id.* The report contains a number of other references to documents, and to the examiner's observation of Mr. Beck (*see, e.g., id.* at 228-29*)*, and the BVA does not reconcile these references with its conclusion that the appellant's "assertions" are the sole basis for the opinions offered by all recent medical examiners.

Upon remand, the Secretary shall fulfill his duty to assist, providing further psychiatric examinations, if warranted. 38 U.S.C. § 5107(a). Mr. Beck is entitled to submit further evidence and argument and to have his claim readjudicated expeditiously. *See* Veterans' Benefits Improvements Act, Pub. L. No. 103-446, § 302, 108 Stat. 4645, 4658 (1994) (found at 38 U.S.C. § 5101 note).

### III. CONCLUSION

Accordingly, the June 25, 1997, Board decision is VACATED, and the matters of whether Mr. Beck is to be granted veteran status for his second period of service by reason of insanity at the time he committed the offenses that led to his OTH discharge, and whether he is entitled to service connection for a chronic psychiatric disorder, are REMANDED for adjudication according to law.