Kevin J. STRUCK, Appellant,

v.

Jesse BROWN, Secretary of Veterans
Affairs, Appellee.

No. 94–322.

United States Court of Veterans Appeals.

May 14, 1996.

William G. Smith, was on the brief, for the appellant.

Mary Lou Keener, General Counsel; Norman G. Cooper, Assistant General Counsel; David W. Engel, Deputy Assistant General Counsel; and Ralph G. Davis, Washington, DC, were on the brief, for the appellee.

Before NEBEKER, Chief Judge, and KRAMER and STEINBERG, Judges.

STEINBERG, Judge:

The appellant, Kevin J. Struck, appeals a March 16, 1994, Board of Veterans' Appeals (BVA or Board) decision concluding that the character of his discharge is a bar to benefits from the Department of Veterans Affairs (VA) other than health care and related benefits under chapter 17 of title 38, U.S.Code. Record (R.) at 19. For the reasons that follow, the Court will affirm the BVA decision.

## I. Background

The appellant served on active duty with the U.S. Army from February 23 to November 15, 1979. R. at 24. Service medical records (SMRs) do not include his induction examination. At separation, his discharge was described as "under other than honorable conditions" (OTHC) based on "conduct triable by a court-martial". *Ibid.* His military records included a charge sheet accusing him of being absent from Fort Benning, Georgia, without authority from July 26, 1979, until October 10, 1979. R. at 28–30. A form verifying his AWOL (absent without leave) status from his commanding officer included a notation to a previous Uniform Code of Military Justice (UCMJ) action (under Article 15 thereof). R. at 31.

While he was pending trial by court-martial for the AWOL offense (under UCMJ Article 86) in October 1979, the appellant apparently signed a statement noting, inter alia, that he was voluntarily requesting a discharge for the good of the service; that he acknowledged his guilt of the charge; and that he understood that he might be discharged under OTHC if his request for discharge were accepted. R. at 34–35, 41–42. The form he signed also stated that he understood that, as a result of such a discharge, he would "be deprived of many or all Army benefits", and "that [he] may be ineligible for many or all benefits administered by [VA]". R. at 35.

An October 1979 mental health SMR reported the appellant's statement that he felt that his mind was "falling apart". R. at 44. The SMR noted that he did not appear delusional and that history included drug abuse with psychiatric hospitalization, and stated: "Mood: angry. Affect: excited. Psychomotor: agitated, pressured speech. [The appellant] reports suicide ideation...." *Ibid.* An impression was deferred pending further evaluation. *Ibid.* An October 1979 psychiatric evaluation SMR diagnosed the appellant with narcissistic personality disorder. R. at 45. It noted a history of "marked social inadaptability" during his tour in the military, and concluded: "[The appellant's] condition is part of a character and behavior disorder due to deficiencies in emotional and

personality development of such a degree as to seriously impair his function in the military service. He uses poor judgment, is not committed to productive goals and is unmotivated." *Ibid.* It noted that at the time of evaluation, "there was no evidence of a mental disease, defect, or derangement sufficient to warrant medical disposition"; that he was "found to be capable of distinguishing right from wrong and of adhering to the right"; and that "[h]e was responsible for his actions and possessed the mental and emotional capacity to understand and participate in board and other legal proceedings." *Ibid.* It was also reported: "At the time of discharge from the hospital[,] the [appellant] was psychiatrically cleared for separation from the service under the provisions of the appropriate administrative regulation". *Ibid.*

On his October 1979 discharge examination report, the appellant stated that his health was "very poor" and that he would not "allow any Army correctional process to be instituted". R. at 37. He noted having experienced, inter alia, nervous trouble as well as having been treated for anxiety at Fort Benning and being hospitalized for anxiety at Olive View Hospital (OVH) in Los Angeles, CA. R. at 37–38. He stated: "I'm going insane. I need to get out so I can get the help I need." R. at 38. A physician's summary noted the appellant's "[p]ains in knees [and] ankles" with persistent swelling and weakness, and described him as "[n]ervous, [and having] worries [and] insomnia about Army life [and] noisy barracks." *Ibid.* The physician reported that the appellant "[s]tate[d he] can't cope [with] Army people [and] routine [and] wants out of Army." *Ibid.* No abnormalities, defects, or diagnoses were noted, and he was found qualified for separation. R. at 39–40. His superiors recommended that he be discharged "for the [g]ood of the [s]ervice", with a "discharge certificate under [OTHC]" based upon a "personal review of [his] request for discharge, pending court-martial charges[,] and rejection of further military service". R. at 32. The reason for the AWOL (as reported by one of his commanding officers) was an inability to handle the procedures of military training. R. at 43.

Sometime prior to March 1981, the appellant filed a claim with a VA regional office (RO) for VA service-connected disability compensation or non-service-connected pension benefits. *See* R. at 52–53 (the application is not in the record on appeal). A March 1981 letter from the appellant's grandfather, John Joyce, informed the RO that the appellant was currently a patient in a private psychiatric hospital at the University of Southern California (USC) Medical Center "for treatment and observation of a schizophrenic condition". R. at 55. Mr. Joyce later wrote VA that he had been issued letters of conservatorship because of the appellant's mental condition; that there had been an incident while the appellant was in service which had resulted in the destruction of some governmental property valued at $22.26; that the appellant had thereafter been "held in the hospital for psychiatric observation"; and that "anxiety over the pending court[-]martial ... [had] prompted the AWOL". R. at 57. The letter also stated that the appellant "had suffered a mental breakdown prior to his enlisting in the Army"; that he "was able to go through basic training and complete paratrooper school prior to his problems"; that, because of his problems, he should never have been offered the type of discharge he was given; and that he had not been "mentally capable of signing a release" (waiver of VA benefits) at the time of his discharge. R. at 57–58. At the bottom of this letter, a statement by the appellant requested to have his discharge voided and active duty reinstated or his discharge upgraded. R. at 58.

Records from the USC Medical Center showed that the appellant had been admitted on February 10, 1981, after swallowing an unspecified amount of valium in an apparent suicide attempt. R. at 191. The report noted: The appellant's "first psychotic break came when he was 24.... At this point we cannot specify the degree to which mind[-]altering drugs are responsible for his illness, and it would seem reasonable to assume that they had certainly contributed to some degree. But there was psychiatric contact long before he began using drugs." R. at 196. The diagnosis was: "Schizophrenia, chronic paranoid (Delusions, hallucinations, thought

disorder, occasional inappropriate affect). Rule out toxic psychosis secondary to drugs." *Ibid.* A February 1981 USC treatment update form stated that his history and the present course of the illness "are compatible with the diagnosis of schizophrenia, chronic paranoid type", and that blood and urine testing were negative for illicit drugs upon admission. R. at 187. Because of "extreme agitation" and violent behavior, the appellant's medication had been increased during February 1981. R. at 187–88. The assessment was that his condition had improved to a very modest degree but that he had remained "grossly psychotic". R. at 188. A September 1981 RO letter informed the appellant that his discharge from service was "under conditions which constitute a bar to the payments of VA benefits" and that he was therefore not qualified for VA benefits with the possible exception of medical treatment for a service-connected disability. R. at 61, 65.

Medical records from 1984 to 1988 show that the appellant was periodically admitted to various mental health facilities because of agitated behavior and self-destructive acts and was diagnosed with, inter alia, schizophrenia. R. at 203–43. A November 1988 psychiatric evaluation report prepared by Dr. Liberman, Professor of Psychiatry, University of California at Los Angeles (UCLA), stated that the appellant has been his patient for the last three years, and that his evaluation included an exhaustive and comprehensive history and mental status examinations. R. at 72–73. Dr. Liberman reported that the appellant "has a well[-]established schizophrenic disorder that has been complicated by repeated episodes of self-abuse and self-mutilation" and that his illness is "a stress-related biomedical disorder". R. at 72. He explained:

> One of the main exacerbations of his illness occurred during his military service. He had received psychiatric treatment prior to entering the military for what appears to have been schizotypal traits often associated with the underlying vulnerability to frank schizophrenia. He was unable to cope with the demands and regimentation of military life. The cumulative stress he experienced during that period led to his developing the prodromal and florid signs and symptoms of schizophrenia and to his discharge from the military. Since his discharge from the military, he has had numerous hospitalizations for chronic and disabling schizophrenia.
>
> There is no evidence of an Axis II Personality Disorder, except for his continuing to exhibit certain dependent traits that have resulted from his longstanding and handicapping schizophrenic disorder.

R. at 72–73.

In a December 1988 letter to the appellant's attorney, Dr. Liberman stated that the appellant's OVH hospitalization for three weeks in 1978, prior to his military service, "was for psychotic symptoms prodromal to schizophrenia", which Dr. Liberman believed "had its full onset during military service due to stress." R. at 75. The letter also noted:

> His 1978 hospitalization was eventuated by abuse of PCP which is often a premonitory stage in the development of schizophrenia. The fact that he was discharged from this hospitalization in remission without the diagnosis of schizophrenia and was subsequently medically cleared for military induction further supports the assumption that his now chronic and disabling schizophrenia was triggered by the stress-related military service.

*Ibid.*

An April 1989 RO decision denied the appellant's request, through counsel, to reopen his character-of-discharge determination under 38 C.F.R. § 3.12. R. at 79, 77. At a July 1989 RO hearing, the appellant's mother testified under oath that while her son was in the military, he had contacted her and told her "that he had to get out and ... was ill". R. at 92, 95. She testified:

> [T]he next thing I knew it was in midsummer in 1979[;] he was in Los Angeles, came to the grandparents' home ...[;] we asked him was he on leave, he said no[;] he said they wouldn't let him out. He said he was sick and he said[:] "I feel like I'm going crazy," and he was very agitated, very upset and he said, "I can't go back," and we said, "Well, let's go back, you know, you're AWOL[,]" and we tried to encourage him, but he was simply terrified that

they would not let him out of the service.... He was simply terrified[;] he was afraid people were putting things in his food.

R. at 92–93.

The appellant testified under oath that military doctors had told him that "with his knee and leg, the way that it was, that [he] would not make it through the infantry training ... and when [he] went back to [his] own unit they put [him] on some details with shovels and stuff and [he] wasn't able to do very much work and they got upset with that and started bothering [him]". R. at 96. As to the reason he went AWOL, he stated that he had "realized that they were not going to give me any slack". *Ibid.* He said that he had understood what he was doing when he signed the discharge papers but that he did not realize that it was going to be so difficult to get VA benefits. R. at 96–97. He stated that he made some calls home but denied saying that he was "going crazy"; he stated: "I just said I couldn't handle it there. They were making me train for all this stuff and I had a bad leg". R. at 96. He testified that after service he had gone through PCP detoxification and somebody had given him pure PCP which had caused him to go blind and that he had been hallucinating ever since; and that in 1978 he had overdosed on valium and was sent to USC Medical Center. R. at 97.

Records from Metropolitan State Hospital in Norwalk, California, indicating that the appellant had been admitted there on April 10, 1980, and discharged on April 24, 1980 (less than five months after his discharge from service) were received by VA in October 1989. R. at 107. The admission and final diagnosis was "schizophrenia chronic undifferentiated type". *Ibid.* That same month, after considering the additional records, the VA hearing officer concluded that there was insufficient evidence "to conclude that [the appellant] was insane and unable to distinguish right from wrong at the time he went AWOL from July 1979 until October 1979". R. at 102. The RO reiterated those findings in August 1990. R. at 120. Later that month, the appellant, his mother, and his grandfather gave sworn testimony before

the Board that largely duplicated the testimony before the RO, except as noted below. R. at 128–51. The appellant's grandfather, Mr. Joyce, testified that the appellant had come to live with him while the appellant was AWOL and that he had stated only "that he was not going back" and that "[h]e didn't give much reasons." R. at 141. After discharge, Mr. Joyce said, the appellant "didn't get along with his grandmother and he'd become very angry from time to time" and had broken things. R. at 142. The Board remanded the matter to the RO in July 1991 for, inter alia, (1) consideration of whether a bar to VA benefits exists on the basis of his other than honorable discharge due to willful and persistent misconduct in light of *Manio v. Derwinski*, 1 Vet.App. 140 (1991); and (2) determination of whether the appellant was insane within the meaning of 38 C.F.R. § 3.354(a) (1995). R. at 158–59.

A July 1992 RO decision on remand from the Board concluded that the evidence of record did not "establish that [the appellant] met the definition of insanity as provided in 38 C.F.R. § 3.354 at the time he had committed the offenses which [led] to his other than honorable discharge". R. at 173–75. In the March 1994 BVA decision here on appeal, the Board concluded that, although new and material evidence had been submitted to reopen the claim concerning the character of his discharge, the evidence of record established that that discharge was a bar to VA benefits other than health care and related benefits under chapter 17 of title 38, U.S.Code. R. at 6, 19.

## II. Analysis

### A. *New and Material Evidence*

■ Under the applicable law, the Secretary must reopen a previously and finally disallowed claim when "new and material evidence" is presented or secured with respect to the basis for the disallowance of that claim. *See* 38 U.S.C. §§ 5108 ("[i]f new and material evidence is presented or secured with respect to a claim which has been disallowed, the Secretary shall reopen the claim and review the former disposition of the claim"), 7105(c) ("[i]f no [NOD] is filed in accordance with this chapter within the prescribed period, the [RO] action or determina-

tion shall become final and the claim will not thereafter be reopened or allowed, except as may otherwise be provided by regulations not inconsistent with this title"); *Suttmann v. Brown,* 5 Vet.App. 127, 135 (1993) (applying section 5108 to claim denied by final RO decision).

■ On a claim to reopen a previously and finally disallowed claim, a "two-step analysis" must be conducted under section 5108. *Manio,* 1 Vet.App. at 145. First, it must be determined whether the evidence presented or secured since the prior final disallowance of the claim is new and material "when viewed in the context of all the evidence, both new and old", *Colvin v. Derwinski,* 1 Vet. App. 171, 174 (1991), and when "the credibility of the [new] evidence" is presumed, *Justus v. Principi,* 3 Vet.App. 510, 513 (1992). Second, if the evidence is new and material, then the claim must be reopened and all the evidence of record reviewed to determine the outcome of the claim on the merits. *See Jones (McArthur) v. Derwinski,* 1 Vet.App. 210, 215 (1991).

■ As to step one, the determination whether to reopen a previously and finally disallowed claim, the Court has synthesized the applicable law as follows:

"New evidence" is that which is not merely cumulative of other evidence of record. [*See Colvin, supra.*] Evidence is "material" where it is relevant to and probative of the issue at hand and where there is a reasonable possibility that, when viewed in the context of all the evidence, both new and old, it would change the outcome.

*Blackburn v. Brown,* 8 Vet.App. 97, 102 (1995); *Cox (Billy) v. Brown,* 5 Vet.App. 95, 98 (1993). The evidence required to reopen must be newly presented or secured evidence that is not cumulative of evidence presented before the last prior disallowance and that is material as to the "issue at hand" (*Cox* and *Colvin,* both *supra* )—that is, it must be probative of the disputed issue which is the basis for the previous final VA adjudication of the claim; if it is, then, when all the evidence (new and old) is viewed, there must be a reasonable possibility that the outcome could be changed. *See Blackburn, Cox,* and *Colvin,* all *supra.* A Board determination as to

whether evidence is "new and material" is a question of law subject to de novo review by this Court under 38 U.S.C. § 7261(a)(1). *See Masors v. Derwinski,* 2 Vet.App. 181, 185 (1992); *Jones,* 1 Vet.App. at 213; *Colvin, supra.*

■ *1. Reopening.* In March 1989, the appellant filed a claim to reopen the character-of-discharge determination made in the RO's September 1981 final decision. Reviewing de novo the evidence submitted thereafter, the Court holds that the appellant submitted new and material evidence to reopen his claim as to the character of his discharge.

Pursuant to 38 U.S.C. § 5303(b), "if it is established to the satisfaction of the Secretary that, *at the time of the commission of an offense* leading to a person's ... discharge, ... that person was insane, such person shall not be precluded from benefits under laws administered by the Secretary based upon the period of service from which such person was separated." 38 U.S.C. § 5303(b) (emphasis added). VA regulations provide the following definition of "insanity" in 38 C.F.R. § 3.354(a):

(a) *Definition of Insanity.* An insane person is one who, while not mentally defective or constitutionally psychopathic, ... exhibits, due to disease, a more or less prolonged deviation from his normal method of behavior; or who interferes with the peace of society; or who has so departed (become antisocial) from the accepted standards of the community to which by birth and education he belongs as to lack the adaptability to make further adjustment to the social customs of the community in which he resides.

38 C.F.R. § 3.354(a). "Thus, the statute sets out the authority for allowing veterans benefits where a party has received an [OTHC] discharge but has been adjudged insane, and the regulation simply defines the term 'insanity.'" *Cropper v. Brown,* 6 Vet.App. 450, 453 (1994).

■ After examining the regulation defining insanity, the Court recently concluded that it was "less than clear given its obvious drafting defects", and that "[t]he only way to read § 3.354(a) so as to avoid [an absurd]

result is to apply the phrase *'due to a disease'* to all three circumstances provided for in the regulation." *Zang v. Brown,* 8 Vet. App. 246, 252–53 (1995). Thus, an insane person is one who, *due to a disease* (1) "exhibits ... a more or less prolonged deviation from his normal method of behavior"; (2) "interferes with the peace of society"; or (3) "has so departed ... from the accepted standards of the community to which by birth and education he belongs as to lack the adaptability to make further adjustment to the social customs of the community in which he resides." *Id.* at 253 (quoting and interpreting § 3.354(a)).

Dr. Liberman's November 1988 report opined that "a main exacerbation of [the appellant's] illness occurred during his military service" and that the "cumulative stress he experienced during that period led to his developing the prodromal and florid signs and symptoms of schizophrenia". This report also challenged the military physician's diagnosis of a personality disorder by stating that there was no evidence of such a disorder. R. at 72–72. The December 1988 medical report also stated Dr. Liberman's opinion that the appellant's current "chronic and disabling schizophrenia was triggered by the stress-related military service". R. at 75. These medical reports are new because they are not cumulative of evidence in the record. They are probative because they show that the appellant was diagnosed with schizophrenia and that such illness existed in service and because they indicate that the appellant may have been insane when he went AWOL. The question of insanity at AWOL is the determinative issue as discussed in part II. B.2.b., below. This new evidence is material because, when viewed in the context of all the evidence or record, there is a reasonable possibility of a changed outcome on the appellant's character-of-discharge determination.

**2. Status as a "veteran".** This Court will not overturn the BVA's factual findings unless they are "clearly erroneous". 38 U.S.C. § 7261(a)(4); *see Francisco v. Brown,* 7 Vet.App. 55, 57 (1994); *Gilbert v. Derwinski,* 1 Vet.App. 49, 52–53 (1990). Under this standard of review, "if there is a

'plausible' basis in the record for the factual determinations of the BVA, even if this Court might not have reached the same factual determinations, [the Court] cannot overturn them." *Gilbert,* 1 Vet.App. at 53. The Board is required to provide a written statement of the reasons or bases for its findings and conclusions on all material issues of fact and law presented on the record; the statement must be adequate to enable a claimant to understand the precise basis for the Board's decision, as well as to facilitate review in this Court. *See* 38 U.S.C. § 7104(d)(1); *Simon v. Derwinski,* 2 Vet. App. 621, 622 (1992); *Masors,* 2 Vet.App. at 188; *Gilbert,* 1 Vet.App. at 57. To comply with this requirement, the Board must analyze the credibility and probative value of the evidence, account for the evidence which it finds to be persuasive or unpersuasive, and provide the reasons for its rejection of any material evidence favorable to the claimant. *See Caluza v. Brown,* 7 Vet.App. 498, 506 (1995); *Gabrielson v. Brown,* 7 Vet.App. 36, 39–40 (1994); *Gilbert, supra.*

**a. Willful and persistent misconduct:** "In order to qualify for VA benefits, a claimant must demonstrate that he, she, or the party upon whose service the claimant predicates the claim [had the status of] a 'veteran.'" *Cropper,* 6 Vet.App. at 452 (citing *Aguilar v. Derwinski,* 2 Vet.App. 21 (1991) and 38 U.S.C. § 1110). A person seeking to establish veteran status must do so by a preponderance of the evidence, and the benefit-of-the-doubt doctrine is not applicable to that determination of status. *See Aguilar, supra.* Pursuant to 38 U.S.C. § 101(2), "[t]he term 'veteran' means a person who served in the active military, naval, or air service, and who was discharged or released therefrom under conditions other than dishonorable."

As noted by the Court in *Cropper,* 38 U.S.C. § 5303 and 38 C.F.R. § 3.12 provide that a discharge under OTHC issued because of willful and persistent misconduct (38 C.F.R. § 3.12(d)(4)) is a bar to VA benefits. However, a discharge because of a minor offense is not considered willful and persistent misconduct "if service was otherwise honest, faithful[,] and meritorious". 38

C.F.R. § 3.12(d)(4). "The BVA's determination whether a discharge is based on willful and persistent misconduct is a matter of fact which the Court reviews under the 'clearly erroneous' standard of review." *Stringham v. Brown,* 8 Vet.App. 445, 447 (1995) (citing 38 U.S.C. § 7261(a)(4) and *Cropper,* 6 Vet. App. at 452).

▮ In this case, the Board found that "[t]he appellant was discharged under OTHC in November 1979 at his request in lieu of facing trial by court[-]martial on a charge of going AWOL from July 26 to October 10, 1979"; that the AWOL episode was of an "ongoing nature" that lasted for approximately 2½ months; and that the AWOL episode "did not terminate of the appellant's own volition." R. at 12. The Board concluded that "his in-service misconduct was persistent and willful, and did not fall within the exception of a 'minor offense' under [38 C.F.R. § 3.12(d) ]". R. at 12–13.

The Court holds that there is a plausible basis in the record for the Board's findings of fact with respect to the issue of willful and persistent misconduct. *See* R. at 24, 28–30; *Cropper* and *Gilbert,* both *supra.* In addition to that misconduct relied upon by the Board, the appellant signed a statement upon termination of his AWOL status acknowledging his guilt of the charge (R. at 34–35, 41–42) and gave sworn testimony that he went AWOL because he "realized that they were not going to give [him] any slack" because of his "bad leg" (R. at 96).

As to the minor-offense exception contained in 38 C.F.R. § 3.12(d)(4), there was a plausible basis for the Board's rejection of this exception. In *Stringham,* 8 Vet.App. at 448, the Court held that unauthorized absence is the type of offense "that would interfere with [an] appellant's military duties, indeed preclude their performance, and thus could not constitute a minor offense". *Stringham,* 8 Vet.App. at 448 (quoting *Cropper,* 6 Vet.App. at 452–53). In *Winter v. Principi,* 4 Vet.App. 29 (1993), the Court held that the Board's finding of willful and persistent misconduct based on an AWOL status for a duration of approximately twenty percent of service time was not clearly erroneous. In this case, the appellant was in AWOL status for almost thirty percent of his time in service (2½ out of 9 months). Consequently, the Court holds that the Board's findings of fact in this case as to the nonapplicability of the minor-offense exception also were not clearly erroneous. *See Stringham* and *Cropper,* both *supra.*

▮ *b. Insanity defense:* The appellant maintains as a defense to the section 5303(a) bar to VA benefits based on the nature of his discharge that he was insane at the time of the offense (his AWOL) causing his discharge. He relies on the Metropolitan State Hospital diagnosis of psychosis within four months after his discharge, and states that because such a diagnosis was made within one year after discharge, that condition is presumed to be service connected. Br. at 16–17.

In *Cropper,* the Court held that section 5303(b) required "that the insanity must be such that it legally excuses the acts of misconduct" and that "there must be a causal connection between the insanity and the misconduct" in order to demonstrate that a claimant's OTHC discharge should not act as a bar to the grant of veterans' benefits. *Cropper,* 6 Vet.App. at 453–54. Because the Court in *Cropper* had based this conclusion in part on provisions in the VA ADJUDICATION PROCEDURE MANUAL, Part IV, ¶¶ 11.01, .11.04, 11.05 (Apr. 3, 1992) and Part VI, ¶ 4.10 (Sept. 21, 1992) [hereinafter M21–1], which have been superseded, the Court today concludes that *Cropper*'s holding regarding causation is no longer operative. *See* M21–1 Part VI, Change 14, ¶ 4.10(c)(1) ("[p]rior to making a determination as to whether a veteran was insane *at the time he or she committed an offense leading to* his or her court-martial, discharge, or resignation, request all obtainable evidence related to the period involved") (emphasis added); M21–1 Part VI, Change 14, ¶ 4.10(c)(2) ("[a]pply the definition of insanity found in 38 C.F.R. [§] 3.354"); ¶ 4.10(e) (a VA administrative decision "finding the veteran to have been sane *at the time in question,* supported by the necessary explanation, is sufficient as to the particular period of service or offense in issue") (emphasis added) (July 1, 1993).

The Court now holds, as did the Court in *Helige v. Principi* prior to the issuance of *Cropper*, that the statute requires that the insanity exist only "at the time of the commission of an offense leading to a person's ... discharge", and not that insanity must cause the misconduct, that is, there need not be a causal connection between the insanity and the misconduct. *Helige*, 4 Vet. App. 32, 34 (1993); *see* 38 U.S.C. § 5303(b). As to whether the appellant was insane at the time he went AWOL in July 1979, the Board found, after considering Dr. Liberman's reports, the hearing testimony, and the various service and other medical records (including the military psychiatrist's report after the appellant's return to military control in October 1979), that "the appellant ha[d] not met the burden of proof that he was insane at the time he went AWOL" (R. at 17). R. at 15–18.

*(i.) Assessing the evidence:* Based on the military psychiatrist's reports in October 1979 and the sworn testimony of the appellant himself that he went AWOL because the military was not cutting him any "slack" based on his injured leg (R. at 96), the Court holds that there is a plausible basis for the Board's finding that he was not insane at the time he went AWOL and that that finding cannot therefore be clearly erroneous. *See Helige*, 4 Vet.App. at 34 (holding that doctor's statements were not material because they failed to opine as to whether veteran was insane at time of commission of offenses that led to his court-martial and discharge); 38 U.S.C. § 5303(b); 38 C.F.R. § 3.354. Indeed, the testimony from the appellant and his family supports that Board finding: Although the appellant's mother testified that he had told her that he was "ill" and felt like he was "going crazy" (R. at 92–93), the appellant denied that he had told his mother this and testified that he had said only that he "couldn't handle it there" because of his "bad leg" (R. at 96). Moreover, his mother described him as having then been only "very agitated", "upset", and "terrified that [the military] would not let him out of the service". R. at 92–93. His grandfather testified that at the time the appellant went AWOL he had stated only "that he was not

going back" and that "[h]e didn't give much reasons." R. at 141.

The Board assessed the credibility of the evidence and provided an adequate statement of reasons or bases for its determination. Although the appellant produced medical evidence in the form of Dr. Liberman's reports to refute the diagnosis made by the military physician, the Board was not required to accept the appellant's evidence and was entitled to weigh the credibility of that evidence. This Court may not, absent clear error, overturn the Board's findings regarding the credibility or probative value accorded Dr. Liberman's reports and the military physician's report. *See Lizaso v. Brown*, 5 Vet.App. 380, 386 (1993) (it is Board's function, and not that of Court, to determine credibility and authenticity of documents in question); *cf. Ohland v. Derwinski*, 1 Vet.App. 147, 149–50 (1991) (remanded in part for failure of BVA to analyze credibility or probative value of evidence). The Court finds the Board's determination that Dr. Liberman's reports were not entitled to much weight to be plausible. *See Godfrey (Robert) v. Brown*, 8 Vet.App. 113, 121–22 (1995) (holding that Board had a plausible basis for rejecting the probative value of doctor's statements). The Board cited numerous reasons why the report was not entitled to probative weight and should be regarded as nothing more than cursory. In determining that Dr. Liberman's statements lacked probative value on the issue whether the appellant was suffering from a serious mental disease at the time he went AWOL, the Board stated:

> The statement by Dr. Liberman that schizophrenia had its full onset during service was made years following service, despite the fact that he had not even seen the appellant until at least the mid-1980s. This conclusion is not at all corroborated by the psychiatric findings documented in service. Thus, he did not have the advantage of first-hand clinical evaluation of the appellant's symptomatology proximate to the time of the events which he discusses. Likewise, his statement that there was no evidence of a personality disorder, except as the result of longstanding schizophrenia,

suffers from the fact that Dr. Liberman did not see the appellant until many years after the onset of schizophrenia, whereas the psychiatrist who evaluated the appellant during service did not report any clinical findings of a psychosis, e.g., delusions or hallucinations, but following a thorough psychiatric evaluation, diagnosed merely a personality disorder. Finally, ... the December 1988 correspondence comments on service medical records and pre-service psychiatric records [were] apparently not actually seen by Dr. Liberman.... Further, the appellant was not inducted into the service, as stated by Dr. Liberman, but he enlisted. The source of much, if not all, of Dr. Liberman's history of the appellant's in-service illness was apparently derived either from the appellant or other second-hand sources, and Dr. Liberman's psychiatric conclusions are only as accurate as the history provided to him.

R. at 15. Where the determinative issue involves medical etiology, competent medical evidence that the claim is "plausible" or "possible" is required. *Grottveit v. Brown*, 5 Vet.App. 91, 93 (1993). Where the appellant's testimony conflicts with his SMRs, the Board is justified in rejecting doctors' opinions based on history related by an appellant. *See Owens v. Brown*, 7 Vet.App. 429 (1995).

■ *(ii.) Effect of section 5125:* The appellant argues that, pursuant to 38 U.S.C. § 5125 (which he mischaracterizes as a "treating physician rule"), the Secretary was required to accept the medical report of Dr. Liberman on the questions of insanity and of the misdiagnosis by the military physician, and that thus the Board's rejection of this medical evidence was clearly erroneous. Br. at 14. Section 5125 is entitled "**Acceptance of reports of private physician examinations**" and provides:

> For purposes of establishing any claim for benefits under chapter 11 or 15 of this title, a report of a medical examination administered by a private physician that is provided by a claimant in support of a claim for benefits under that chapter *may be accepted* without a requirement for confirmation by an examination by a physician employed by the Veterans Health Ad-

ministration if the report is sufficiently complete to be adequate for the purpose of adjudicating such claim.

38 U.S.C. § 5125 (emphasis added). This law was enacted in 1994 while the appellant's case was on appeal in this Court. *See* Veterans' Benefits Improvements Act of 1994, Pub.L. No. 103–446, § 301(b), 108 Stat. 4645, 4658 (Nov. 2, 1994). In enacting section 5125, Congress gave no indication that the new law should not have retroactive effect; hence, the appellant is entitled to have this law applied to his case. *See Karnas v. Derwinski*, 1 Vet.App. 308, 312–13 (1991) ("where the law or regulation changes after a claim has been filed or reopened but before the administrative or judicial appeal process has been concluded, the version most favorable to appellant should ... apply unless Congress provided otherwise or permitted the Secretary ... to do otherwise and the Secretary did so").

However, the applicability of section 5125 does not help the appellant under the facts of this case. The new provision is permissive in nature, although clearly it would not permit the Board to act in an arbitrary and capricious manner in not crediting a claimant's medical evidence. *See Bailey v. Derwinski*, 1 Vet.App. 441, 445–46 (1991); *Foster v. Derwinski*, 1 Vet.App. 393, 394 (1991) (per curiam); *Smith (Barbara) v. Derwinski*, 1 Vet.App. 267, 279 (1991). In the instant case, the Court holds that the Board was not *required* to accept the report under section 5125, as long as it provided an adequate statement of reasons or bases for its rejection. As we have found above, the Board did just that.

■ *(iii.) Effect of one-year presumption period:* The appellant's argument that he is entitled to service connection for schizophrenia because he obtained such a diagnosis within the one-year presumption period is unavailing because he has not established that he is a "veteran" under the applicable laws. *See Biggins v. Derwinski*, 1 Vet.App. 474, 477 (1991) (seven-year presumption of service connection for multiple sclerosis contained in 38 U.S.C. § 312(a)(4) not available to appellant because she did not meet definition of "veteran" found in 38 U.S.C. §§ 337 and 101(2)); *Colon v. Brown*, 9 Vet.App. 104,

107 (1996); *Sandoval v. Brown,* 7 Vet.App. 7, 9 (1994); *Aguilar,* 2 Vet.App. at 23. Moreover, even assuming the appellant had showed that he had "veteran" status, the one-year post-service presumption would still not assist him in establishing that he was "insane" at the time he committed the AWOL offense.

### B. Finality of September 1981 RO Decision

The appellant contends that the 1981 RO decision never became final and was still before the Board for its initial review in 1994. As explained below, even assuming the appellant is correct on this point, it is not determinative in the outcome of this case because, as concluded in part II.A.2., above, he has not demonstrated that he acquired "veteran" status.

The Court need not decide whether the BVA erroneously treated the 1981 RO decision as final and required new and material evidence pursuant to 38 U.S.C. §§ 5108 and 7105(c) to reopen the appellant's March 1989 claim, rather than reviewing that 1981 claim as an original claim, because, the Court concludes, the Board, in its decision on appeal, reopened the claim and adjudicated the matter on the merits. The Court has assumed that the claim is one to reopen and held that there is new and material evidence to reopen and address the merits. *See Moray v. Brown,* 5 Vet.App. 211, 214 (1993) (quoting *Gobber v. Derwinski,* 2 Vet.App. 470, 472 (1992) (" '[n]ew and material evidence' is, by its nature, well-grounded, i.e., evidence that, if believed, would provide a 'reasonable possibility' that the outcome would be changed")). Because the claim warrants an adjudication on the issue of "veteran" status and the Board conducted one, even assuming (without deciding) that the Board erred in treating the appellant's claim as one to reopen, there is no prejudice to him because any such error does not affect the outcome of his case. *See* 38 U.S.C. § 7261(b) (Court shall take due account of rule of prejudicial error).

Because the appellant has not shown "veteran" status, any earlier effective date of an ultimate award of service connection (*see Mason (Sangernetta) v. Brown,* 8 Vet.App. 44, 51 (1995); 38 U.S.C. § 5110(a); 38 C.F.R. § 3.400(b)(2) (1995)) that would follow from the 1981 RO decision being found not final is not at issue here. Such an award could come about only if the character of the appellant's discharge from service were not a bar to VA benefits. Because, as more fully discussed in part II.A.2., above, the Court will affirm the Board's finding that the character of the appellant's discharge is a bar to VA benefits, the Court need not, and therefore does not, address the finality question.

### C. Duty to Assist

■ The appellant argues that VA failed in its duty to assist by not giving him a physical or psychiatric examination to determine whether he was "insane" at the time he committed the offense (AWOL) which led to his discharge and to determine whether the military physician's diagnosis of a personality disorder was incorrect. Br. at 12–13. The Secretary contends that the duty to assist extends only to "veterans" and that the appellant is not a veteran and has not met his burden of demonstrating his status. The Secretary is correct. The determinative issue here is the appellant's status as a veteran. The duty to assist under 38 U.S.C. § 5107(a) attaches only when a VA "claimant" submits a well-grounded claim. *See Aguilar,* 2 Vet.App. at 23; *Littke v. Derwinski,* 1 Vet.App. 90, 91–92 (1990). The appellant cannot be a claimant unless he first establishes "veteran" status. *See Colon, Sandoval,* and *Aguilar,* all *supra.* Because, as concluded in part II.A.2., above, the appellant has not met his burden of showing such status by a preponderance of the evidence (*see Stringham,* 8 Vet.App. at 449; *Aguilar, supra*) by submitting competent medical evidence that he was insane at the time of his AWOL offense, his claim for a service-connected disability cannot be well grounded, and thus no section 5107(a) duty to assist was triggered in this case. *See Stringham,* 8 Vet.App. at 449; *Espiritu v. Derwinski,* 2 Vet.App. 492, 494 (1992); *see also Grottveit,* 5 Vet.App. at 93.

### III. Conclusion

Upon consideration of the record and the briefs of the parties, the Court holds that the

appellant has not demonstrated that the BVA committed error—in its findings of fact, conclusions of law, procedural processes, and articulation of reasons or bases—that would warrant remand or reversal under 38 U.S.C. §§ 101(2), 1110, 5107(a), 5108, 5303, 7104(a) and (d)(1), and 7105(c), and the analysis in *Gilbert, supra.* Therefore, the Court affirms the March 16, 1994, BVA decision.

AFFIRMED.