# UNITED STATES COURT OF APPEALS FOR VETERANS CLAIMS

No. 02-793

WILLIAM W. DeBeaord, Jr., Appellant,

v.

Anthony J. Principi,
Secretary of Veterans Affairs, Appellee.

On Appeal from the Board of Veterans' Appeals

(Decided    September 14, 2004    )

*Mark R. Lippman*, of La Jolla, California, was on the brief for the appellant.

*Tim S. McClain*, General Counsel; *R. Randall Campbell*, Assistant General Counsel; *Carolyn F. Washington*, Deputy Assistant General Counsel; and *Rebecca Ahern Baird*, all of Washington, D.C., were on the brief for the appellee.

Before KRAMER, *Chief Judge*, and STEINBERG and GREENE, *Judges*.

STEINBERG, *Judge*:   The appellant, through counsel, seeks review of a May 28, 2002, Board of Veterans' Appeals (BVA or Board) decision that denied (1) an increased rating for Department of Veterans Affairs (VA) service-connected postoperative residuals of a right-eye injury, (2) special monthly compensation (SMC) based on bilateral blindness pursuant to 38 C.F.R. § 3.383(a)(1) (2001), and (3) a rating of total disability based on individual unemployability resulting from a service-connected disability (TDIU) under 38 C.F.R. § 4.16 (2001).  Record (R.) at 1-32.  The appellant and the Secretary each filed a brief, and the appellant filed a reply brief.  For the reasons set forth below, the Court will affirm the May 2002 BVA decision on appeal.

## I.  Relevant Background

The veteran served honorably on active duty in the U.S. Army from January 1946 until March 1947.  R. at 49.  His separation examination report noted that he had "[p]oor eyesight" in the

"left" eye "due to [t]rauma [existing prior to service]"; that report also recorded that the veteran's uncorrected left-eye vision was 20/20 and that his uncorrected right-eye vision was limited to light perception only. R. at 53. Following his separation, the veteran filed a claim for VA service connection for a right-eye injury. In October 1981, he underwent a VA compensation and pension (C&P) medical examination; the examination report indicated that his corrected left- and right-eye vision was 20/20 and 20/400, respectively, for both near and far vision. R. at 89. Later that month, a VA regional office (RO) denied his claim for VA service connection because his separation examination report had noted that his injury had existed prior to service. R. at 105, 107. In September 1982, the veteran provided sworn testimony at a hearing before the VARO. R. at 150-55. He testified that during service he had been struck by a bulldozer cable, resulting in scarring to his right-eye pupil. R. at 150. Also at that hearing, the VA hearing officers opined that the veteran's separation report was factually incorrect with regard to which eye had sustained an injury. R. at 151. In October 1982, the RO granted service connection for a right-eye injury and assigned a 30% rating, effective from July 24, 1980, under 38 C.F.R. § 4.84a, Diagnostic Code (DC) 6009 and DC 6077 (1982). R. at 182-83.

In June 1983, the veteran underwent another VA visual examination; that examination report recorded the veteran's corrected left- and right-eye "distance" vision as 20/20 and "count fingers at 6 feet", respectively. R. at 192. Thereafter, the veteran filed multiple unsuccessful claims for an increased rating for his right-eye disability. R. at 200, 215, 239, 246, 256-57. In November 1988, he underwent a penetrating keratoplasty (cornea transplant) of his right eye; the surgery report indicated that at that time his left-eye visual acuity was "20/40 +1 with best correction" and his right-eye visual acuity was "count fingers". R. at 230. In May 1992, he filed another increased-rating claim, stating that "[b]oth of [his] eyes [we]re getting much worse." R. at 274. In March 1993, the RO denied that claim because "evidence of visual acuity of 5/200 or less [had] not [been] demonstrated." R. at 461. The RO also denied service connection for any visual impairment of the left eye because that disability had not manifested itself until many years after service and was not shown to be secondary to his service-connected right-eye injury. *Ibid*. In July 1993, a VA ophthalmology examination report noted that the veteran had been diagnosed with glaucoma, that his corrected left- and right-eye vision was 20/30 +2 and 20/400, respectively, and that his right-eye

2

decreased vision was "at least partly secondary to the corneal transplant." R. at 544-45. Subsequent outpatient treatment records reported that he had been diagnosed as "legally blind" in the right eye and had experienced "gradually decreasing vision" in the left eye, both in "acuity" and "field". R. at 574. In January 1995, he was hospitalized for "[r]apid progressive optic neuropathy", "[g]laucoma", and "[s]tatus post left parietal occipital infarction". R. at 565. His hospitalization record noted that he had "decreased peripheral vision" of his left eye and "rapid vision loss . . . which [could ]not be explained totally by his glaucoma." R. at 565-66.

In February 1996, the RO (1) denied a rating in excess of 30% for the veteran's right-eye disability, (2) granted SMC based on loss of use of one eye, having only light perception, and (3) denied SMC based on aid and attendance for bilateral blindness. R. at 625-26. The RO noted that his claims had been denied, in part, because of his failure to report for his scheduled VA C&P examination. *Ibid.* Thereafter, the veteran underwent that examination in June 1996. R. at 617-22. The examination report recorded his left eye as having 20/60 uncorrected and 20/30 corrected near vision and 20/80 uncorrected and 20/40 corrected far vision; his uncorrected near- and far-right-eye vision was recorded as light perception and his corrected right-eye vision as 20/400. R. at 617. The report also indicated that he had bilateral glaucoma and that he had a visual-field deficit in his left eye with concentric contraction to less than 30 degrees but no more than 15 degrees, thus making his left-eye vision equivalent to 20/100. R. at 617-19. In July 1996, the RO found that he did not have loss of use of the left eye as defined for VA purposes to mean "light perception with [the] inability to recognize test letter[s] at one foot and when counting fingers can not [sic] be accomplished at 3 feet" and thus again denied his claim for an increased rating. R. at 653 (citing 38 C.F.R. § 4.79 (1995)). The veteran then filed a Notice of Disagreement (NOD) as to that RO decision (R. at 656) as well as an application for a TDIU rating (R. at 659-60). In February 1997, the RO denied his TDIU-rating claim and determined that the issue was "part and parcel" of the appeal of the July 1996 RO decision (R. at 689-90) and issued a Supplemental Statement of the Case (SSOC) that addressed all three of the veteran's claims. R. at 694-98.

In May 1997, the RO received correspondence from Dr. Terri Key, chief of ophthalmology at the Reno, Nevada, VA Medical Center; Dr. Key indicated that the veteran had "end[-]stage glaucoma and a cataract" and "a best corrected vision of 20/50 -2" in his left eye and opined that the

3

veteran was "severely visually impaired". R. at 716. In March 1999, the Board remanded the veteran's claims for further development and readjudication. R. at 758-67. In June 1999, a VA examining physician recorded that the veteran's left- and right-eye vision was "20/60" and "count fingers", respectively, and opined that he was "severely impaired" "given the longstanding history of visual loss [in his right eye] and progressive glaucoma [in his left eye] and [the] small amount of central island of vision remaining in the left eye." R. at 841. The examining physician further stated that, although the left-eye vision was "still 20/60, the amount of visual field [was] very small [and] causes great functional impairment." *Ibid*. With reference to these findings, the RO issued an SSOC indicating that the veteran's claims for an increased rating, for SMC based on bilateral blindness, and for a TDIU rating had been denied. R. at 849-51. The veteran appealed that decision to the Board, and in March 2000 the Board issued a decision also denying those three claims. R. at 864-97.

Subsequently, the veteran filed another increased-rating claim asserting that he was "legally blind in both eyes". R. at 900. A June 2000 C&P examination report recorded his corrected-right-eye near and far vision as "light perception" and his corrected-left-eye near and far vision as 20/400; the report also indicated that his left-eye visual field was "severely constricted" "to around 15 degrees of center vision" and that he was "legally blind". R. at 903-04, 906. In November 2000, the RO again denied the veteran's claim for an increased rating because the evidence did not "show blindness in the non[-]service-connected left eye." R. at 914-17. The veteran appealed that RO decision to the Board, and in September 2001 the Court vacated a March 2000 BVA decision and remanded the matters for readjudication in light of the enactment of the Veterans Claims Assistance Act of 2000 (VCAA), Pub. L. No. 106-475, 114 Stat. 2096. *DeBeaord v. Principi*, No. 00-574, 2001 WL 1538510 (Vet. App. Sept. 18, 2001).

In the May 2002 BVA decision here on appeal, the Board, inter alia, chronicled the various medical-examination findings and denied an increased disability rating, an increased rate of SMC, and a TDIU rating. R. at 20-32. The Board first noted that the veteran was then rated as 30% disabled, the maximum schedular rating for blindness in a service-connected eye with no blindness in the other, non-service-connected eye. R. at 22. The Board stated that "[f]or VA purposes, blindness will be held to exist when there is an inability to recognize test letters at 1 foot (.30 meters), and when further examination of the eyes reveal[s] that perception of objects, hand

4

movements[,] or counting fingers cannot be accomplished at 3 feet (.91 meters)." R. at 22 (citing 38 C.F.R. §§ 3.350 and 4.79 (2001)). As to the applicable definition of blindness, the Board concluded as follows:

> The argument has also been made that the applicable regulatory provisions of 38 U.S.C.[] § 1160 and 38 C.F.R. § 3.383 do not set forth a precise definition of "blindness" for VA rating purposes. It is contended that in the absence of a definition specifically noted in these provisions, that [sic] the RO should utilize the definition for "legal blindness" for purposes of establishing entitlement to benefits. It is noted that while a definition of blindness is purportedly noted in the context of 38 C.F.R. § 4.79, there is no clinical basis noted in support of VA's reliance on such this [sic] interpretation. The Board does not agree.

R. at 27. The Board, relying upon the definition of blindness set forth in 38 C.F.R. § 4.79, determined that the appellant's "left[-]eye [vision] does not meet . . . VA requirements to be considered blind" and thus denied a rating in excess of 30% on the basis of its conclusion that "the veteran cannot, as a matter of law, be considered blind in his left eye for VA purposes" because the veteran's left-eye visual acuity of 20/400 and constriction of the visual field to 10-15 degrees did not equate to blindness as defined by VA. R. at 22.

With regard to the veteran's SMC claim, the Board determined that the requirements for SMC at a rate other than that which the appellant was then assigned had not been met because the veteran was not blind in the left eye. *Ibid*. As to the veteran's claim for a TDIU rating, the Board noted that the veteran had only one service-connected disability, rated as 30% disabling, which did not meet the rating threshold necessary to be awarded a TDIU rating. R. at 29. The Board then considered whether an extraschedular rating was appropriate. *Ibid*. In denying an extraschedular rating, the Board found that, although "the veteran [was then] unemployable, . . . the veteran's sole service[-]connected disability of right[-]eye blindness [did] not alone render him unemployable." R. at 31.

5

## II.  Analysis

### A.  Contentions of Parties

On February 27, 2003, the appellant filed a brief in which he argues that the May 2002 Board decision should be reversed and the matters remanded because the Board erred by applying 38 C.F.R. § 4.79 (2001) in order to define "blindness" for purposes of 38 U.S.C. § 1160(a)(1).  Brief (Br.) at 8-13.  He asserts that, by failing to define blindness in section 1160(a)(1), Congress intended a "common" or "legal" definition of the word.  Br. at 10, 12.  As evidence in support of his argument, he points to the fact that Congress has, in other sections of title 38, U.S. Code, defined "blindness" and has not amended the language of section 1160(a)(1) or incorporated the language of § 4.79 despite having amended several times other portions of that same statutory provision.  Br. at 11-12. The appellant also contends that any ambiguity in section 1160(a)(1) should be resolved in his favor. Br. at 12 (citing *Brown v. Gardner*, 513 U.S. 115, 118 (1994)).  He further states that his claims for an increased rating, for SMC, and for a TDIU rating are "inextricably intertwined" with the definition of blindness under section 1160(a)(1) and therefore must be remanded for further development and adjudication.  Br. at 13.

The Secretary counters that, under 38 C.F.R. § 4.84a, DC 6070 (2001), the appellant is not entitled to an increased rating because he "is receiving the maximum schedul[a]r rating for blindness in one, service-connected eye."  Br. at 12.  He also asserts that, for purposes of section 1160(a)(1), the Board's interpretation of "blindness", as defined in § 4.79, is reasonable because it is identical to the definition of "blindness" that Congress set forth in 38 U.S.C. § 1114(k), as implemented at 38 C.F.R. § 3.350(a)(4), and should, therefore, under *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984), be upheld.  Br. at 13-15, 19-20.  He contends that, because "Congress had ample opportunity to change the language regarding blindness", congressional silence is equivalent to congressional approval of VA's implementation and interpretation of section 1160(a)(1).  Br. at 16-17.  With regard to the TDIU-rating claim, the Secretary argues for affirmance of the Board decision because the appellant's schedular disability rating does not meet the 60% regulatory threshold for a TDIU rating under 38 C.F.R. § 4.16.  Br. at 18.  As to the appellant's argument that a "legal" definition of blindness should apply for purposes of section 1160(a)(1) and § 3.383(a)(1), the Secretary asserts that it is without merit and unsupported

by authority. Br. at 19.

In reply, the appellant asserts that congressional intent on the issue is clear and therefore *Chevron* is not applicable to the instant case. Reply at 2-5. He argues, with supporting documentation, that, at the time that Congress enacted section 1160, blindness was generally defined as "central visual acuity of no greater than 20/200 in the better eye with corrected vision." Reply at 6-7 (citing, *e.g.*, HELGA LENDE, FEDERAL LEGISLATION CONCERNING BLIND PERSONS IN THE UNITED STATES AND INSULAR POSSESSIONS, 5 (American Foundation for the Blind, Legislation Series No. 1, 1958)).

### B. Applicable Law and Regulation

Chapter 11 of title 38, U.S. Code, governs claims for compensation by veterans for their service-connected disabilities. Section 1160(a)(1) of title 38, U.S. Code, allows for special consideration for certain cases of loss of paired organs; specifically, that section provides, in pertinent part:

> Where a veteran has suffered (1) blindness in one eye as a result of service-connected disability and blindness in the other eye as a result of non-service-connected disability not the result of the veteran's own willful misconduct . . . the Secretary shall assign and pay to the veteran the applicable rate of compensation under this chapter as if the combination of disabilities were the result of service-connected disability.

38 U.S.C. § 1160(a)(1) (2003). The regulation implementing 38 U.S.C. § 1160 provides, in pertinent part (the following regulatory cites are to the current regulation, which was the same at the time of the May 2002 BVA decision):

> Compensation is payable for the combinations of service-connected and non[-]service-connected disabilities specified in paragraphs (a)(1) through (a)(5) of this section as if both disabilities were service connected, provided the non[-]service-connected disability is not the result of the veteran's own willful misconduct.
>
> (1) Blindness in one eye as a result of service-connected disability and blindness in the other eye as a result of non-service-connected disability.

38 C.F.R. § 3.383(a)(1) (2003).  Section 4.79, of title 38, Code of Federal Regulations, provides:

> Loss of use or blindness of one eye, having only light perception, will be held to exist when there is inability to recognize test letters at 1 foot (.30m.) and when further examination of the eyes reveals that perception of objects, hand movements[,] or counting fingers cannot be accomplished at 3 feet (.91m.), lesser extents of visions, particularly perception of objects, hand movements, or counting fingers at distances less than 3 feet (.91 m.), being considered of negligible utility. With visual acuity 5/200 (1.5/60) or less or the visual field reduced to 5[ degrees] concentric contraction, in either event in both eyes, the question of entitlement on account of regular aid and attendance will be determined on the facts in the individual case.

38 C.F.R. § 4.79 (2003).

### C.  Definition of Blindness for Section 1160 Purposes

Regarding the appellant's argument that the Board erred in utilizing § 4.79 in order to define "blindness" for purposes of the paired-organ provisions of section 1160 and § 3.383, he asserts that § 4.79 imposes a stricter standard of blindness than that of section 1160 and is thus inconsistent with the plain language and the underlying purpose of that statutory provision.  Br. at 9.  The Court interprets a statute de novo.  *See Butts v. Brown*, 5 Vet.App. 532, 539 (1993) (en banc).  "'The starting point in interpreting a statute is its language.'"  *Lee (Raymond) v. West*, 13 Vet.App. 388, 394 (2000) (quoting *Good Samaritan Hosp. v. Shalala*, 508 U.S. 402, 409 (1993)).

> The "plain meaning [of a statute] must be given effect unless a 'literal application of [the] statute [or regulation] will produce a result demonstrably at odds with the intention of its drafters.'"  *Gardner v. Derwinski*, 1 Vet.App. 584, 586-87 (1991), *aff'd sub nom. Gardner v. Brown*, 5 F.3d 1456 (Fed. Cir. 1993), *aff'd*, 513 U.S. 115 . . . (1994); *Fagan*[ *v. West*], 13 Vet.App. [48,] 52 [(1999)]; *Curtis*[ *v. West*], 11 Vet.App. [129,] 133 [(1998)].  "If the intent of Congress is clear, that is the end of the matter".  *Skinner v. Brown*, 27 F.3d 1571, 1572 (Fed. Cir. 1994) (quoting *Chevron,* [467 U.S. at 842]), *aff'ing* 4 Vet.App. 141 (1993) (mem.).

*Lee (Raymond)*, *supra*.  "'[E]ach part or section [of a statute] should be construed in connection with every other part or section so as to produce a harmonious whole.'"  *Meeks v. West*, 12 Vet.App. 352,

354 (1999) (quoting 2A N. Singer Sutherland on Statutory Construction § 46.01 (5th ed. 1992)), *aff'd,* 216 F.3d 1363 (Fed. Cir. 2000); *see Cottle v. Principi*, 14 Vet.App. 329, 334 (2001); *Talley v. Derwinski*, 2 Vet.App. 282, 286 (1992).

> "[I]t [is] fundamental that a section of a statute should not be read in isolation from the context of the whole act, and that in fulfilling our responsibility in interpreting legislation, 'we must not be guided by a single sentence or member of a sentence, but [should] look to the provisions of the whole law, and to its object and policy.'"

*Moreau v. Brown*, 9 Vet.App. 389, 396 (1996) (quoting *Richards v. United States*, 369 U.S. 1, 11 (1962) (quoting *Mastro Plastics Corp. v. NLRB*, 350 U.S. 270, 285 (1956))), *aff'd*, 124 F.3d 228 (Fed. Cir. 1997). Under *Chevron,* a reviewing court generally must defer to permissible agency constructions of a statutory provision, if "Congress has not directly addressed the precise question at issue." *Chevron*, 467 U.S. at 843; *see Barnhart v. Walton,* 535 U.S. 212, 217-18 (2002). However, a competing principle of statutory construction particularly applicable in this Court is that, where a veterans benefits statute is ambiguous, "interpretive doubt is to be resolved in the veteran's favor." *Gardner*, 513 U.S. at 118; *see Allen (Alfred) v. Brown*, 7 Vet.App. 439, 448 (1995) (en banc) (applying *Gardner* principle to rule in appellant's favor on question of statutory interpretation).

Even where the meaning of a statutory provision is ambiguous, the Court must take care not to invalidate otherwise reasonable agency regulations simply because they do not provide for a pro-claimant outcome in every imaginable case. In *Disabled American Veterans v. Gober* (*DAV v. Gober*), the U.S. Court of Appeals for the Federal Circuit (Federal Circuit) characterized the *Gardner* doctrine as "modifying the traditional *Chevron* analysis" but cautioned that a veteran "'cannot rely upon the generous spirit that suffuses the law generally to override the ***clear meaning*** of a particular provision.'" *DAV*, 234 F.3d 682, 692 (Fed. Cir. 2000) (emphasis added) (citing *Boyer v. West*, 210 F.3d 1351, 1355 (Fed. Cir. 2000) (quoting *Smith (William A.) v. Brown*, 35 F.3d 1516, 1526 Fed. Cir. (1994))). The Federal Circuit has also stated in discussing the *Chevron* standard and *Gardner* cannon of construction: "Moreover, where the application of customary canons of statutory construction points in opposite directions, we resort to the *Chevron* principle." *Paralyzed Veterans of Am. v. Sec'y of Veterans Affairs* (*PVA v. Secretary*), 345 F.3d 1334, 1340 (Fed. Cir. 2003) (citing *Nat'l Org. of*

*Veterans' Advocates v. Sec'y of Veterans Affairs*, 260 F.3d 1365, 1377 (Fed. Cir. 2001)).

The basic purpose of the chapter 11 compensation provisions is to recompense veterans for conditions that are a result of or arise during their service. *See* 38 U.S.C. § 1110 ("[f]or disability resulting from personal injury suffered or disease contracted in line of duty . . . during a period of war, the United States will pay to any veteran thus disabled . . . compensation as provided in this subchapter"); 38 U.S.C. § 1131 ("[f]or disability resulting from personal injury suffered or disease contracted in line of duty . . . during other than a period of war, the United States will pay to any veteran thus disabled . . . compensation as provided in this subchapter"). Section 1160(a) makes a clear exception to this policy of compensating for only those conditions that were incurred or aggravated in service. Section 1160(a)(1) provides that a veteran who has suffered "blindness in one eye as a result of service-connected disability and blindness in the other eye as a result of non-service-connected disability" will be assigned and paid the "applicable rate of compensation . . . as if the combination of disabilities [was] the result of service-connected disability", 38 U.S.C. § 1160(a)(1) – in other words, the veteran will be paid disability compensation as if the non-service-connected vision impairment in one eye were service connected, even though it is not, as long as the impairment in the other eye is service-connected blindness. Section 1160 contains no definition for the term "blindness". *See* 38 U.S.C. § 1160. Elsewhere in chapter 11, however, Congress has provided the following six differing definitions of blindness that is service connected: (1) "[H]aving only light perception", 38 U.S.C. § 1114(k); (2) "blind in both eyes, with 5/200 visual acuity or less", 38 U.S.C. § 1114(*l*); (3) "blindness in both eyes, rendering such veteran so helpless as to be in need of regular aid and attendance", 38 U.S.C. § 1114(m); (4) "without light perception in both eyes", 38 U.S.C. § 1114(n); (5) "anatomical loss of both eyes", *ibid.*; and (6) "service-connected blindness having only light perception or less", 38 U.S.C. § 1114(o), (p). Hence, although "blindness" is not defined in section 1160 for paired-organ compensation purposes, it is defined repeatedly in section 1114 for purposes of providing additional compensation (SMC) to veterans who have service-connected blindness in both eyes under the rating schedule; such veterans are entitled to a 100% schedular rating under 38 C.F.R. § 4.84a, as described below.

Specifically, the Secretary has provided in 38 C.F.R. § 4.84a the following DCs for assigning a 100% rating to the service-connected impairment of both eyes in terms of central visual acuity:

(1) Anatomical loss of both eyes (DC 6061); (2) blindness in both eyes having only light perception (DC 6062); (3) anatomical loss of one eye and 5/200 vision in the other eye (DC 6063); (4) blindness in one eye having only light perception and 5/200 vision in the other eye (DC 6067); and (5) vision in each eye of 5/200 (DC 6071). 38 C.F.R. § 4.84a, DCs 6061, 6062, 6063, 6067, 6071 (2003). These criteria generally follow the definitions provided for SMC purposes in statutory section 1114, described above, with two exceptions: First, there does not appear to be a § 4.84a regulatory definition that tracks the subsection (m) reference to "blindness in both eyes, rendering such veteran so helpless as to be in need of regular aid and attendance", 38 U.S.C. § 1114(m); *see* 38 C.F.R. § 3.350(c)(1)(v); second, in DC 6080 the Secretary has provided a 100% rating for impairment of field vision that is "concentric contraction to . . . 5º . . . [b]ilateral". 38 C.F.R. § 4.84a, DC 6080 (2003); *see* 38 C.F.R. § 3.350(b)(2) (2003) (providing that "[c]oncentric contraction of the field of vision beyond 5 degrees in both eyes is the equivalent of 5/200 visual acuity" and thereby warrants payment of SMC at the subsection (*l*) level). Given what appear to be seven different regulatory definitions, it surely would have been far preferable for the Secretary to have included a definition of blindness in § 3.383(a)(1) and the resulting "'confusing tapestry' of VA regulations . . . should be the subject of review and reevaluation by the Secretary." *Zang v. Brown*, 8 Vet.App. 246, 255 (1995) (Steinberg, J., separate views) (citing, inter alia, *Talley*, 2 Vet.App. at 285-86, 288, and *Hatlestad v. Derwinski*, 1 Vet.App. 164, 167 (1991)).

Nonetheless, the Board here, rather than looking to the multiple alternative definitions of blindness set forth in part 3 of title 38 of the Code of Federal Regulations, as described above, for purposes of the payment of 100% schedular disability compensation and of SMC as well for service-connected blindness of both eyes, seemed to be relying on § 4.79 in determining the appellant's entitlement to a section 1160 100% rating. Although the Board does cite to § 3.350 in its decision (R. at 22), there is no analysis of the § 3.350 criteria in connection with the appellant's increased-rating claim (*see* R. at 20-24; thus, it appears that § 4.79 was the only regulatory section considered by the Board. However, § 4.79, which has the heading "Loss of use of one eye, having only light perception", merely defines light perception and has no apparent applicability to rating bilateral blindness, except for a reference to "both eyes" in the second sentence that is seemingly inconsistent with the heading of the section. To the extent that § 4.79 does track the blindness DCs described above, it is not clear

11

that that section includes (1) "blind[ness] in both eyes, with 5/200 visual acuity or less", 38 U.S.C. § 1114(*l*); *see* 38 C.F.R. § 4.84a, DC 6071, or (2) blindness as a result of the "[c]oncentric contraction of the field of vision beyond 5 degrees in both eyes", 38 C.F.R. § 3.350(b)(2); *see* 38 C.F.R. § 4.84a, DC 6080. Regarding the second sentence in § 4.79, it appears to indicate only that a veteran can qualify for aid and attendance, rather than specifying a rating percentage, if the visual field in both eyes is reduced to 5 degrees concentric contraction or the vision is 5/200. As to the degree of vision impairment that must accompany helplessness for purposes of subsection (m) SMC, the Secretary has specified that the veteran must have 5/200 or less vision in both eyes. 38 C.F.R. § 4.84a, Table IV, footnote 1 (2003). In that regard, we note that Table IV is partially headed "Table for Rating Bilateral Blindness" and thus could be perceived as setting forth definitions to be used for purposes of the application of section 1160 and § 3.350 in determining whether there is bilateral blindness. However, placing much reliance on Table IV for assigning schedular ratings would appear questionable given that the content of that table relates only to the payment of SMC under specific section 1114 subsections (*l*), (m), and (n) and does not refer to the field-vision blindness set forth in DC 6080, described above. Moreover, the authority for prescribing Table IV is shown as 38 U.S.C. § 1115 ("Additional compensation for dependents"), but there is nothing in section 1115 or the corresponding text of § 4.84a to explain the purpose of Table IV. Although section 1114 appears to be the correct authority for this table, which seems to be an explanation of what is provided for as to blindness in § 3.350, there is no cross-reference in § 3.350 to this table or in this table to § 3.350. The closest pertinent reference is footnote 5 (coming without any antecedent footnotes 1, 2, 3, or 4) stating "[a]lso entitled to [SMC]", that follows Table V ("Ratings for Central Visual Acuity Impairment"), a table that appears to summarize in tabular form what is provided for in DCs 6071 to 6079.

Despite this virtually incomprehensible array of loosely connected or unconnected tables and footnotes and DCs, *see Zang, Talley*, and *Hatlestad*, all *supra*, we find the basic principle of the statutory and regulatory provisions at issue, section 1160(a)(1) and § 3.383(a)(1), quite clear: If the impairment of a veteran's vision would result in a 100% rating if the impairment in both eyes were service connected but the impairment in one eye actually was not service connected, then VA is to pay compensation as though the non-service-connected vision impairment in one eye were service connected. Accordingly, the Secretary has no alternative but to apply each of the seven regulatory

definitions of blindness to the non-service-connected eye in order to determine whether, under any of those definitions, the appellant is entitled to the benefit of the special "paired organ" provision. Hence, consideration must be given to (1) § 3.350 and § 4.84a, Table IV, as to SMC, (2) § 4.84a, DCs 6061, 6062, 6063, 6067, and 6071 and Table V, as to impairment of central visual acuity, and (3) § 4.84a, DC 6080, as to impairment of field vision.

Moreover, even though the Secretary's regulations do not contain an explicit definition of blindness for section 1160(a)(1) and § 3.383(a)(1) purposes, it is also clear to the Court that the "common" or "legal" definition that the appellant seeks to have applied cannot be the recognized definition of blindness, because to define blindness for purposes of section 1160(a)(1) and regulation § 3.383(a)(1) in terms other than those already set forth in chapter 11 of title 38 of the U.S. Code and part 3 of title 38 of the Code of Federal Regulations in order to assess bilateral service-connected blindness would contradict the section 1160(a)(1) "as if" language. Moreover, applying the more generous definition that the appellant proposes would result in compensating a veteran for a non-service-connected degree of impaired vision at a rate higher than the rate that would apply if the same degree of vision impairment *had* resulted from service. This would be an absurd result that Congress could not have intended and is not, therefore, one that could possibly be adopted in a VA regulation.[1] It is incumbent on VA to interpret the statutory provision in such a way as to make sense in the context of the full statutory scheme for disability compensation set forth in chapter 11 of title 38, U.S. Code, of which both sections 1114 and 1160 are a part. *See United Sav. Ass'n of Tex. v. Timbers of Inwood Forest Assocs.*, 484 U.S. 365, 371 (1988) (stating that "[a] provision that may seem ambiguous in isolation is often clarified by the remainder of the statutory scheme – because the same terminology is used elsewhere in a context that makes its meaning clear or because only one of the permissible meanings produces a substantive effect that is compatible with the rest of the law") (citations omitted). Finally, the appellant, in essence, is seeking to have the Court rewrite section 1160(a)(1) for blindness in a way not dissimilar to a December 2002 liberalization that Congress made

---

[1] *See United States v. X-Citement Video, Inc.*, 513 U.S. 64, 68-69 (1994); *Timex V.I., Inc. v. United States*, 157 F.3d 879, 886 (Fed. Cir. 1998); *Trilles v. West*, 13 Vet.App. 314, 324 (2000) (en banc)*; Simmons v. Principi*, 17 Vet.App. 104, 114 (2003); *Thayer v. Principi*, 15 Vet.App. 204, 210 (2001); *Cottle v. Principi*, 14 Vet.App. 329, 334 (2001); *Faust v. West*, 13 Vet.App. 342, 350 (2000); *Davenport v. Brown*, 7 Vet.App. 476, 483-84 (1995); *Conary v. Derwinski*, 3 Vet.App. 109, 111-12 (1992) (per curiam order) (Steinberg, J., concurring).

to section 1160(a)(3) for deafness, at which time Congress made no change to section 1160(a)(1) for blindness. *See* Veterans Benefits Act of 2002, Pub. L. No. 107-330, § 103, 116 Stat. 2820 (eliminating requirement of total deafness for purposes of paired-ear hearing loss); 69 Fed. Reg. 48,148, 48,149-50 (Aug. 9, 2004) (amending 38 C.F.R. § 3.383(a)(3)). The remedy that the appellant seeks is therefore within the province of the legislative and executive branches, which, respectively, make and execute the laws.

Because we find no ambiguity in the statutory or regulatory scheme that would permit "blindness", for section 1160/§ 3.383 purposes, to be interpreted as the appellant contends, we are not called upon to address the appellant's argument that any ambiguity in section 1160(a)(1) should be resolved in his favor (Br. at 12) or to consider the application of the doctrine of *Gardner, supra*, regarding resolving "interpretive doubt", given the Federal Circuit's discussion in *PVA v. Secretary, supra*, that seems to bypass the Supreme Court's *Gardner* directive. If we had been required to deal with an ambiguous statutory scheme, however, it is not altogether clear that we would have to abandon the directive of the Supreme Court in *Gardner*, that "interpretive doubt is to be resolved in the veteran's favor", a directive derived from *King v. St. Vincent's Hospital*, 502 U.S. 215, 220-21, n.9 (1991), a case issued seven years after *Chevron*, that applied that interpretive principle to "read [a regulation] in [the veteran's] favor", and that drew that principle from *Fishgold v. Sullivan Drydock & Repair Corp.*, 328 U.S. 275, 285 (1946), a case decided long before *Chevron*. Not only was that canon confirmed by the Supreme Court in *Gardner* ten years after *Chevron*, but it is one tailored specifically to veterans benefits statutes as contrasted with the more general statutory-construction principle set forth in *Chevron, supra*. *Cf. Edmond v. United States*, 520 U.S. 651, 657 (1997) (stating that "[o]rdinarily, where a specific provision conflicts with a general one, the specific governs"); *HCSC-Laundry v. United States*, 450 U.S. 1, 6 (1981) (per curiam) (noting that "it is a basic principle of statutory construction that a specific statute . . . controls over a general provision . . . , particularly when the two are interrelated and closely positioned"); *Coady v. Vaughn*, 251 F.3d 480, 484 (3d Cir. 2001) (applying the "well-established canon of statutory construction that when two statutes cover the same situation, the more specific statute takes precedence over the more general one"). In the last analysis, guidance from the Supreme Court would appear necessary to resolve this matter definitively.

14

### D. Increased-Rating Claim

The appellant urges us to reverse the BVA decision's denial of a paired-organ rating under section 1160/§ 3.383. That we cannot do. The assignment of a rating to a particular disability is a question of fact, which is reviewable in this Court under the "clearly erroneous" standard set forth in 38 U.S.C. § 7261(a)(4). *See Butts,* 5 Vet.App. at 535-37; *id.* at 542 (Steinberg, J., concurring) (citing *Lovelace v. Derwinski*, 1 Vet.App. 73, 74 (1990)). Under that deferential standard, this Court may reverse a BVA finding of fact as clearly erroneous only when, "'although there is evidence to support it, . . . [we] on the entire evidence [are] left with the definite and firm conviction that a mistake has been committed'", *Gilbert v. Derwinski*, 1 Vet.App. 49, 52 (1990) (quoting *United States v. U.S. Gypsum Co.*, 333 U.S. 364, 395 (1948)), such as when there is no "'plausible' basis" in the record, "'viewed in its entirety'", for such a BVA determination, *id.* at 52-53 (quoting *Anderson v. City of Bessemer City*, 470 U.S. 564, 573-74 (1985)); *see Mariano v. Principi*, 17 Vet.App. 305, 313 (2003) (applying "clearly erroneous" standard to assess, as directed by 38 U.S.C. § 7261(b)(1), Board application of 38 U.S.C. § 5107(b) "equipoise standard").

In denying a rating in excess of 30% for the appellant's service-connected postoperative residuals, the Board reviewed the appellant's VA medical examination reports and found that the appellant's 20/400 left-eye vision in June and July 2000, although "significantly worse than that of 20/60 . . . [in] 1999, . . . still does not meet the definition of blindness for VA purposes." R. at 22. The Board noted that the appellant was "receiving the maximum [rating] for . . . blindness in the service-connected right eye, [with] no blindness in his non[-]service-connected left eye." *Ibid*. Although the Board was not correct in applying the definition of blindness found in § 4.79 because that regulation merely defines light-perception blindness and does not provide specifically that a veteran is blind if the visual field in both eyes is reduced to 5 degrees concentric contraction or the vision is 5/200, *see* 38 C.F.R. § 4.84a, DCs 6067, 6071, 6080, the Board, nonetheless, did in fact consider the appellant's left-eye visual acuity in connection with the alternative regulatory definitions of blindness, and concluded correctly, as to each such definition, that the appellant was not blind in his left eye for VA-compensation purposes. Specifically, the Board stated that (1) "there is no evidence of enucleation or a serious cosmetic defect in addition to total loss of vision in the right eye"; (2) "the [appellant] was shown to have vision in the left eye of 20/400" – that is, that his vision deficiency was not 5/200, the

15

minimum deficit that would seem to warrant a 100% rating for service-connected blindness; and (3) "[t]he worst constriction of the [appellant]'s visual field . . . was . . . to only 10-15 degrees . . . [and he] has never been found to have a visual field contraction limited to 5 degrees" – that is, not a constriction that would warrant a 100% rating under DC 6080. R. at 22. Therefore, the Board had a plausible basis in the record, viewed in its entirety, for finding that, for section 1160/§ 3.383 paired-organ purposes, the appellant is not blind in his left eye, *see Gilbert*, *supra*; hence, the Court cannot conclude that the denial of a 100% rating pursuant to section 1160/§ 3.383 was clearly erroneous. *See* 38 U.S.C. § 7261(a)(4).

### E. Increased-SMC Claim

The appellant is currently receiving SMC at the subsection (k) rate. He sought an increased SMC rate, which the Board denied; he now argues for a remand of his SMC claim because it is "inextricably intertwined with the applicable definition of blindness." Br. at 13. In denying the appellant's claim for SMC based on bilateral blindness, the Board discussed all relevant statutory and regulatory provisions and stated:

> [T]he veteran's left eye does not meet . . . VA requirements to be considered blind, nor does the appellant have a service-connected disability of the left eye. The worst corrected rating of the veteran's left eye, 20/400, with visual field constriction of 10-15 degrees, does not meet . . . VA's definition of blindness. Thus, the requirements for [SMC] at any rate other than the present rate prescribed by [section] 1114(k) have not been met.

R. at 28. Because the Court has concluded in part III.D, above, that section 1160 blindness has been defined within the statutory and regulatory scheme and is, therefore, affirming the Board decision as to paired-organ rating entitlement and the appellant makes no other arguments regarding an increased-SMC claim, the appellant has provided no basis for a remand as to that claim.

### F. TDIU-Rating Claim

Basic eligibility for TDIU requires, inter alia, that the veteran be unable to secure or follow a substantially gainful occupation because of service-connected disabilities and have "disabilities resulting from common etiology or a single accident" that have been assigned a combined rating of

16

at least 60%. 38 C.F.R. § 4.16(a)(2) (2003); *see Roberson v. Principi*, 251 F.3d 1378, 1384 (2001) (holding that VA must consider TDIU rating "once a veteran submits evidence of a medical disability and makes a claim for the highest rating possible, and additionally submits evidence of unemployability"); *see also Norris (Robert) v. West*, 12 Vet.App. 413, 419-21 (1999) (concluding that appellant had presented informal claim for TDIU rating when he had been assigned service-connected rating of at least 60% and record on appeal contained evidence of unemployability due to that disability). Moreover, veterans "who are unemployable by reason of service-connected disabilities, but who fail to meet the percentage standards set forth in [38 C.F.R. § 4.16(a)]" should be given extraschedular consideration under § 4.16(b). 38 C.F.R. § 4.16(b) (2003).

In the instant case, the appellant also argues for a remand of his TDIU-rating claim because it is "inextricably intertwined with the applicable definition of blindness." Br. at 13. Here, the appellant is service connected for one disability – the postoperative residuals of a right-eye injury, rated at 30%. Having determined that the appellant cannot be considered "blind" in his left eye for purposes of section 1160(a)(1), the Court holds that the Board correctly concluded that, because "the only condition for which service connection has been established is not rated at least 60[%] disabling, the criteria for a [schedular TDIU] rating under the provisions of . . . § 4.16(a) are not met." R. at 29. In evaluating whether there were circumstances in the appellant's case, apart from any non-service-connected condition and advancing age, that would justify an extraschedular TDIU rating under § 4.16(b), the Board noted that the medical evidence of record "suggests that the appellant is indeed unemployable" but "clearly shows that such unemployability is the result of multiple non-service-connected disabilities." R. at 31. Because the evidence does not show that the appellant's right-eye injury, by itself, renders him unemployable, the Court concludes that a plausible basis exists for the Board's decision with respect to the claim for an extraschedular TDIU rating, *see Gilbert*, *supra*. Therefore, the Court cannot conclude that the Board's denial of an extraschedular TDIU rating was clearly erroneous. *See* 38 U.S.C. § 7261(a)(4); *Gilbert*, *supra*.

### III.  Conclusion

On the basis of the above analysis, the record on appeal, and the parties' pleadings, the Court holds that the appellant has not demonstrated that the BVA committed error – in its findings of fact, conclusions of law, compliance with procedural requirements, articulation of reasons or bases, or application of the equipoise standard – that would warrant reversal or remand under 38 U.S.C. §§ 1110, 5107, 7104(a) or (d)(1), or 7261. Accordingly, the Court will affirm the May 2002 Board decision.

AFFIRMED.